**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William R. CODY, Defendant and Appellant.**

**No. 12572.**

Supreme Court of South Dakota.

Argued Nov. 9, 1979.

Decided June 11, 1980.

Rehearing Denied July 17, 1980.

Brent A. Wilbur, Sp. Asst. to Atty. Gen., for plaintiff and appellee; Lori Wilbur, Asst. Atty. Gen., Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Lee A. Tappe of Tappe & Vavra, P. C., Platte, for defendant and appellant; Terry L. Pechota, Mission, on brief.

HENDERSON, Justice.

## ACTION

Appellant William R. Cody, a/k/a William Weeks, was convicted in a trial by jury

of murder and sentenced to life imprisonment. We reverse and remand for a new trial.

## FACTS

On February 28, 1978, Cody was arrested in Las Vegas, Nevada, on an unlawful flight warrant issued by a Pennington County Magistrate on a charge of embezzlement and grand larceny. On that same day, a preliminary information and arrest warrant were filed in Tripp County charging Cody with the murder of Edmund Brown, a Winner, South Dakota businessman. Cody was incarcerated in the Clark County jail in Las Vegas that afternoon; he was later taken into the interrogation room and interrogated first by Assistant District Attorney Steve Carson and Detective David Hanson, both of Las Vegas. From approximately 5:00 p. m. to 9:30 p. m., Cody was then interrogated by Marc Tobias, an attorney representing the Division of Criminal Investigation for the State of South Dakota.

During this four-hour interrogation by Tobias, which was tape recorded and later transcribed, Cody was never afforded counsel, although several requests for counsel were made by Cody. During the later stages of the interview, however, Tobias apparently contacted a Las Vegas attorney, Howard Miller, at Cody's request. Tobias informed Cody that Miller would not come to the jail that evening unless Cody paid Miller a $1,000 retainer. Cody was unable to retain Miller. Shortly after the interview was concluded, Tobias then telephoned John Hughes, an attorney in Sturgis, South Dakota, at Cody's request. According to Cody, he talked to Hughes for approximately three minutes. There is a conflict as to whether Tobias was privy to this conversation or what matters were discussed. Hughes signed an affidavit outlining his perception of the events that evening; the affidavit, however, was not made a part of the record. The record does reveal, however, that shortly after talking to Hughes, Detective Santongue obtained from Cody a signed consent to search his room at the Aladdin Hotel, which he had earlier refused. The search resulted in uncovering incriminating evidence against him.

On the morning of March 1, 1978, Cody was again interviewed by Tobias. This session, with the exception of the first forty-five minutes, was also tape recorded and later transcribed. Cody still persisted in being represented by counsel at this time, but again his request went unheeded.

On March 2, 1978, Tobias again briefly met with Cody for the purpose, according to Tobias, of informing him of the travel arrangements back to South Dakota the next morning. During this "meeting," as the state prefers to characterize it, Tobias commented on the evidence which had been found implicating Cody with the Brown murder. This fifteen minute conversation was not taped; however, Tobias claims that during such time Cody made approximately twenty-four incriminating statements, all of which were admitted at trial. There is a conflict in the testimony whether Tobias, at any time during the course of this exchange, ever re-advised Cody of his rights; however, the record does reflect that Tobias was aware that while Cody had not retained counsel, he had conferred with Attorney Pike of Las Vegas earlier that day.

Appellant raises 103 assignments of error which allegedly occurred at the pretrial and trial stages. Since we are reversing and remanding this case for new trial, we need address only those issues dispositive of this appeal and those issues which warrant consideration in a new trial.

## ISSUES

### I.

Did the trial court err in denying appellant's motion to suppress statements made by appellant to Marc Tobias during the course of three separate interrogations, having ruled that appellant effectively waived his rights under the Fifth and Sixth Amendments of the United States Constitution?

## II.

Did the trial court err in denying appellant's motion to suppress evidence obtained from the search of appellant's hotel room pursuant to a consent to search form signed by appellant?

## III.

Whether the jury instruction on premeditated design to effect death given at trial, and SDCL 22–16–4 and SDCL 22–16–5 under which appellant was convicted of murder, are unconstitutional in that the burden is allegedly shifted to a defendant to raise reasonable doubt as to the nonexistence of a premeditated design?

## I.

### MIRANDA WAIVER

We first turn to a consideration of appellant's claim that his Fifth and Sixth Amendment rights were violated by the admission at his trial of certain incriminating statements made by him after repeated requests for an attorney. A suppression hearing was held on May 15, 1978, at which time the trial court heard the testimony of Tobias, Detective Santongue of Las Vegas and Cody, in addition to receiving the transcript of the Cody/Tobias February 28 and March 1 interviews. The court found, based on the evidence introduced and the totality of the circumstances, that Cody's several requests for the presence of an attorney did not constitute a present request; rather, Cody's requests merely reflected a desire to speak to an attorney at some undetermined later time before answering certain questions and issuing a formal, complete, and signed statement. The court concluded that Cody, by continuing to discuss the murder of Ed Brown in generalities without the presence of counsel, did knowingly, voluntarily, and intelligently waive and abandon any rights afforded to him under the Constitution. In reading the same transcript and considering the totality of the circumstances, we conclude otherwise.

The record indicates that Cody was advised of his rights as required by the *Miranda* ruling at the outset of both the February 28 and March 1 interviews. The Cody/Tobias transcript also reflects that during the initial stages of the February 28 interview, Cody was apparently willing to discuss with Tobias his general whereabouts and activities over the previous three week period. Later during the interview, however, once he realized that there was a murder charge pending against him, the record reflects that Cody made numerous requests to see an attorney. Whether Cody had effectively waived his right to retained or appointed counsel at the time these incriminating statements were made is a question of federal constitutional law. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1978); *State v. Arpan*, 277 N.W.2d 597 (S.D.1979). We are not constrained by the usual strictures of the "clearly erroneous" standard; the question of waiver requires an "application of constitutional principles to the facts as found." *Brewer v. Williams*, 430 U.S. at 403, 97 S.Ct. at 1242, 51 L.Ed.2d at 439, citing *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (separate opinion).

█ The rule established in the seminal case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), sets forth:

If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. (footnote omitted).

*Id.* at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. If the interrogation continues, any uncounselled confession or incriminating statements may not be introduced into evidence against the accused unless the state

can sustain its "heavy burden" of demonstrating beyond a reasonable doubt that the accused voluntarily, knowingly and intelligently waived his right against self-incrimination and his concomitant right to the presence of counsel. *Miranda*, supra. In *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the United States Supreme Court noted that the question of whether the accused waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in *Miranda*." 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292.

Recent United States Supreme Court decisions have held that the question of waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused," as set forth in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). *See North Carolina v. Butler*, supra; *Brewer v. Williams*, supra; and *Fare v. Michael*, 439 U.S. 1310, 99 S.Ct. 3, 58 L.Ed.2d 19 (1978). At the same time, however, the Court has been quick to reiterate that the courts must indulge in every reasonable presumption against waiver. *North Carolina v. Butler*, supra; *Brewer v. Williams*, supra.

The scope of our review mandates inquiry into all the circumstances surrounding the interrogation in determining whether waiver can be clearly inferred from Cody's actions. Cody was initially booked for embezzlement and grand larceny. The arrest report reveals that on the afternoon of February 28, 1978, Cody had also been charged with murder; however, at that time he had not been formally booked on that charge. Tobias admitted at the suppression hearing that his sole purpose in flying to Las Vegas was to question Cody concerning the Brown murder. Tobias was aware that an arrest warrant was being filed in Tripp County that afternoon charging Cody with murder.

It was not until late into the February 28 interview, however, that Tobias eventually disclosed to Cody that he was a prime suspect in the Brown murder. In fact, in viewing the transcript of the tape-recorded interview, it is quite apparent that Tobias intentionally deferred Cody's questions as to the nature of the actual charges pending against him. This is evidenced in two earlier portions of the interview: [1]

CODY: I most certainly did not know the extent of this situation, now I'm charged with murder. I assumed it was financial—

TOBIAS: You haven't been charged with that.

CODY: Just so I could not get out of jail.

TOBIAS: You haven't been charged with that, you're charged with grand larceny. There's a warrant that's been issued out of the Pennington County Sheriff's Office.

CODY: Okay, if that's, if its financial I'll —— (inaudible)

TOBIAS: Okay, we'll take one thing at a time.

CODY: Okay. I wanta know about this murder thing.

TOBIAS: Okay, well, let me back up in my head logically so, okay, so you've been on and off for the past three weeks?

CODY: Right, I've been trying to put together a show.

A few minutes later into the interview, the following exchange took place:

CODY: What I saw coming down is some . . . from the State's Attorney's Office in Rapid City coming out here.

TOBIAS: No, he won't, but there is ah, or maybe the state's attorney, ah, from Tripp County coming down and—

CODY: Tripp County.

TOBIAS: I don't know what his problem is, but—

CODY: What's Tripp worried about?

---

1. The transcript of the interview uses Cody's alias, William Weeks, but for consistency, we will refer to him as Cody.

TOBIAS: I don't know what his problem is,[2] but I came up here interviewing you.

■ We allude to the initial stages of the interview because in determining whether there has been a knowing, voluntary, and intelligent waiver, a factor to consider is whether the accused knew the nature of the offense with which he was charged or of which he was suspected. *See* 18 U.S.C. § 3501(b). While we do not deem this single factor to be determinative of the issue, it does lend significant insight into whether Cody's initial willingness to talk was in fact prompted by his misconception of the gravamen of the impending charges against him. It is interesting to note how the tenor of the interview markedly changes once Tobias informs Cody that he is the prime suspect in the Brown murder. At that point, Cody immediately requests to see an attorney, as evidenced by the following exchange:

TOBIAS: OK, so you know that's where I'm at and like I said, you know, I'd sure like you to give me a, I hate to use a pun but, a blow by blow account.

CODY: Let me talk to an attorney.

TOBIAS: OK.

CODY: And then we'll go from there. How long is that going to take you? I'd rather get it done now. While—

TOBIAS: (interrupting) OK.

CODY: If I can talk to Melinda,[3] then if I can get an attorney.

TOBIAS: Oh, I can get you a lawyer.

CODY: I don't want any lawyer. I want a man that is competent, that is going to protect me but yet—

TOBIAS: Well, I can tell you right now what the lawyer's going to tell you.

CODY: What's that?

TOBIAS: He's going to tell you, don't say a word. You know don't even talk to him. If they got their case let em prove it. If I were the defense lawyer that's exactly what I'd tell you. You know, obviously—

CODY: What I've done here is wrong.

TOBIAS: I don't know if it's wrong or right, you've told me the story.

CODY: OK.

TOBIAS: That's what I'm telling ya. I'm not giving you legal advice and I don't want you to misconstrue it. I'm just levelin' with you, that's exactly what I'd tell you. I don't know if you can get out.

CODY: Well, I didn't kill anybody; I know I can get out.

TOBIAS: If you didn't do it, why don't you tell me what you know about it and who did.

CODY: I don't know how to do that.

Cody's response at that point was sufficiently clear to trigger the constitutional protections demanded by *Miranda*. Although Tobias testified that from that point on he attempted to assist Cody in obtaining counsel, the transcript evidences that the questioning continued. There is no indication that the recorder was ever turned off until 7:31 p. m., which was several minutes after Cody's initial unequivocal demand to see an attorney. When the interrogation resumed at 9:13 p. m., Cody still had not been afforded counsel. Shortly thereafter, Cody again asked to see an attorney. In fact, the transcript is replete with requests for an attorney once Cody had been apprised that he was a murder suspect. Cody's attempts to exercise his rights were met in each instance with the response, "okay," "uhumm," or followed by another question.

At the second interrogation on March 1, Cody still had not been afforded counsel. He apparently had asked for an attorney at some time during the forty-five minute untaped portion as reflected by Tobias' statement on tape: "You indicated that you wanted a lawyer and I indicated that we won't make a statement until you have a lawyer. Is that correct?"

---

**2.** Tobias knew what the "problem" was; the truth of the matter was that Tobias knew at that time Cody was being charged with murder.

**3.** A female friend of Cody's in Las Vegas.

The trial court seemed to place much emphasis on the fact that even after Cody made reference to the need for counsel, he nevertheless continued to talk to Tobias, characterizing his request for counsel as a "desire to obtain counsel at some future time." Thus, finding Cody's statements to be voluntary, the trial court concluded that he effectively waived his rights under *Miranda*. In viewing the totality of the circumstances, we cannot agree with this appraisal; the trial court erred in its application of federal constitutional law to the facts presented.

This Court has rejected a per se rule that once having requested counsel, an accused may never, until he has actually conferred with an attorney, waive his right to counsel. We have nevertheless cautioned that:

> A waiver made after assertion of a right to counsel should be viewed with skepticism; once an individual decides that he is incapable of communicating with authorities absent counsel, we should be very suspicious of a later, counselless waiver.

*State v. Arpan*, 277 N.W.2d at 600 (citing *People v. Parker*, 84 Mich.App. 447, 454, 269 N.W.2d 635, 638 (1978)). In particular, we noted that police and law enforcement officials should not be permitted to ignore a suspect's request for a lawyer; "interrogation must cease until, at the least, a reasonable *opportunity* to obtain counsel has been afforded." *Id.* at 600, citing *People v. Parker*, supra at 454, 269 N.W.2d at 638.

■ This is not to say, however, that once the right to counsel has been asserted, all further communication is barred between the accused and the interrogating officer. *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir. 1978). We recognize those situations which *Miranda* itself contemplated:

> If [a suspect] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent.

384 U.S. at 485, 86 S.Ct. at 1633, 16 L.Ed.2d 730. Those jurisdictions which have rejected a literal interpretation of *Miranda* have held that where a suspect's desires are expressed in such an equivocal fashion, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes. *Nash v. Estelle*, 597 F.2d 513–14 (5th Cir. 1979); *United States v. Rodriguez-Gastelum*, supra; *State v. Weinacht*, 203 Neb. 124, 277 N.W.2d 567 (1979). This, however, does not license the questioning officer to utilize the guise of clarification as a subterfuge for coercion or for eliciting a retraction of a previously invoked right. This type of prosecutorial stratagem would constitute continued interrogation prohibited by the mandates of *Miranda*.

■ In examining the record, there is no doubt that at the moment Tobias unveiled to Cody the fact that he was a prime murder suspect, Cody's demands to see an attorney were unequivocal, as evidenced by his immediate response: "Let me talk to an attorney. And then we'll go from there. How long is that going to take you? I'd rather get it done now." Pursuant to the dictates of *State v. Arpan*, supra, at that point the quest for information should have ceased until either Cody obtained counsel or, in the event his efforts failed, the court could have appointed one for him. Assuming that Cody's express reference for the presence of an attorney could be deemed equivocal, Tobias' subsequent questioning nevertheless blatantly ran afoul of that permissible under the "equivocalness exception." *See United States v. Rodriguez-Gastelum*, supra; *Pierce v. Cardwell*, 572 F.2d 1339 (9th Cir. 1978); *Nash v. Estelle*, supra; *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976); *State v. Weinacht*, supra. Tobias' questions were not designed to seek a clarification; rather, they clearly embraced the form of further interrogation. The mere fact that Cody responded to certain questions and made incriminating statements after his unequivocal request for an attorney does not support the presumption of a valid waiver. *Arizona v. Miranda*, supra. It is this type of prosecu-

torial gamesmanship which *Miranda* denounced. Cody's initial request for counsel went unheeded, as did his several other requests throughout the course of the interview. Moreover, while Cody never expressly invoked his right to remain silent at the inception of the February 28 interview, his immediate demand to see an attorney, coupled with his response, "What I've done here is wrong," once he was informed of being a prime suspect in the Brown murder, militates against a finding of a knowing, voluntary, and intelligent waiver. Therefore, the state having failed to prove beyond a reasonable doubt an intentional relinquishment or abandonment of a known right or privilege, the February 28 interrogation should have been suppressed in its entirety.

Furthermore, all statements made during the March 1 interview must likewise be suppressed. At such time, Cody still had not been afforded counsel. Tobias' own statements reveal that Cody had specifically stated he would offer no statement concerning his possible involvement in the matter without first consulting an attorney. Yet, in derogation of Cody's express wishes, Tobias continued to elicit information from him. Both the March 1 and February 28 interrogations were severely infected with constitutional infirmities which demanded suppression.

We now turn to the March 2 "meeting" between Tobias and Cody, where Cody uttered his most damaging self-inculpatory statements. This particular "meeting" was not taped. Tobias testified that he did not go to the jail that evening for the express purpose of further interrogating Cody, but rather to inform him of the travel arrangements back to South Dakota the next morning. It was at this time, however, that Tobias confronted Cody with incriminating evidence that had been found pursuant to the search of his hotel room. According to Tobias, Cody then responded with several incriminating comments to the effect that

he had been in Winner, South Dakota, on the evening Brown was murdered.

█ Whether this meeting was a concerted effort toward further interrogation bears significantly on the issue of waiver of counsel, for as the United States Supreme Court stated in *Brewer v. Williams,* "[N]o such constitutional protection would . . come into play if there [has] been no interrogation." 430 U.S. at 400, 97 S.Ct. at 1240, 51 L.Ed.2d at 437.

Recently, the United States Supreme Court in *Rhode Island v. Innis,* —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), addressed for the first time the meaning of "interrogation" under *Miranda.* The Court concluded that "The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." —— U.S. at ——, 100 S.Ct. at 1685. The Court went on to explain:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at ——, 100 S.Ct. at 1685.

In the March 2 "meeting," Tobias not only advised Cody of the incriminating evidence which had been obtained, but he also proceeded to ask him questions pertaining to his possible involvement in the Brown murder including: whether the murder weapon was a hammer or the butt of a gun; whether Brown was in bed at the time he was killed; and whether Cody was surprised to find the large amount of money that Brown kept in the house. Cody was clearly subjected to express questioning; furthermore, Tobias should have known that this line of questioning was reasonably likely to invite an incriminating response. We are convinced after reviewing the suppression hearing transcript and the Tobias "summary"[4] submitted to the trial court,

---

4. Tobias reconstructed his factual version of those portions of the interrogations which were not taped and denominated it as a "summary."

that the questioning which transpired during this time clearly constituted interrogation.

The state argues, however, citing *United States v. Pheaster*, supra, *United States v. Hodge*, 487 F.2d 945 (5th Cir. 1973), and *United States v. Davis*, 527 F.2d 1110 (9th Cir. 1975), that a crucial distinction has been drawn between continued questioning and informing the accused of the available evidence against him, which does not fall within the realm of interrogation. These cases, which this Court made reference to in *State v. Arpan,* supra, hold that while continued questioning of a suspect about his involvement in a crime is impermissible after a request for an attorney is made, and statements made thereafter are inadmissible in the absence of waiver, the police may nevertheless present *incriminating* evidence to the suspect notwithstanding that the suspect has requested an attorney. *See also Pierce v. Cardwell*, supra, and *United States v. Rodriguez-Gastelum*, supra.

The case at bar is distinguishable from these decisions in which waivers were found. In *Hodge*, once the suspect requested an attorney, the agent terminated the interview, informed him of the military procedure to obtain counsel, and explained the charges and evidence against him. Apparently prompted by the evidence already in the government's hands, Hodge then changed his mind and volunteered to make a statement. In *Davis*, after indicating his desire not to talk to the FBI agent, Davis was shown a bank surveillance photograph of himself participating in the robbery and was asked whether he wanted to reconsider his position. After examining the picture, Davis responded, "Well, I guess you've got me," and proceeded to sign a waiver of his rights under *Miranda*. In *Pheaster*, after being advised of his rights, the defendant

asked for an attorney and refused to answer questions. At such time, the defendant was in a car enroute to the county jail. Notwithstanding his assertion of the right to counsel, the agent engaged in a recitation of the evidence against him. Intermittently, the agent also asked where the kidnapped victim was being held. Upon hearing that a fingerprint on one of the notes had been positively identified as his, the defendant admitted his complicity and then cooperated with the agents.[5]

It is critical to note that in each of these cases, there was not an intentional delay in providing an attorney in the hope that the suspect would yield to pressure and recant his demand for an attorney. The statements obtained came as a result of an objective, undistorted presentation of the evidence against each defendant. Moreover, the questioning did not begin until the suspects had clearly indicated their willingness to cooperate.

We do not find each of these elements present here. For three days Cody was incarcerated without representation of counsel, and on each of these three days he was subjected to further interrogation. While we do not question the veracity of the evidence presented, the record does not reveal that Cody had clearly indicated his willingness to cooperate. Furthermore, there is a genuine conflict as to whether Tobias ever readvised Cody of his rights prior to the March 2 interrogation. It cannot be said that the state has proven beyond a reasonable doubt that Cody voluntarily relinquished his right to counsel, which he had repeatedly asserted on the two previous days. Here, Cody persistently sought representation of counsel throughout the three days he was incarcerated in the Clark County jail. In fact, Tobias was aware that he had talked with Attorney

---

**5.** While in *Pheaster* the court admitted that arguably there was an element of interrogation, the court noted that the agent's questions concerning the whereabouts of the kidnapped victim were reasonable and did not rise to the level of interrogation prohibited by *Miranda*. Here, however, Tobias' probing questions into Cody's possible involvement and knowledge of

the surrounding circumstances were unreasonable absent evidence of a valid waiver, and therefore, rose to the level of interrogation prohibited by *Miranda*. In light of the recent United States Supreme Court decision in *Rhode Island v. Innis*, supra, the holding in *Pheaster* is questionable.

Pike on the morning of March 2. This, coupled with his express remark during the March 1 interview that he would not make a statement until he had a lawyer, refutes any suggestion that Cody waived his right to counsel. On the contrary, Cody's actions and statements were the clearest expression of his desire to have an attorney present prior to any interrogation.

At the time of the March 2 interrogation, Cody had been singled out as the prime suspect in the Brown murder investigation. The nature of the proceeding had changed from investigatory to accusatory. Accordingly, Cody was entitled to have a lawyer present during the interrogation, either retained or appointed, unless waived. *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In the absence of an effective waiver, "any statement obtained after such request without the presence of a lawyer would not be admissible in evidence." *State v. Seal*, 83 S.D. 455, 463, 160 N.W.2d 643, 648 (1968).

▮ Under all the facts and circumstances of the case, we conclude as a matter of law that the state did not demonstrate a knowing, voluntary, and intelligent waiver of the right to counsel by Cody during the February 28, March 1 and March 2 interrogations. These statements, obtained throughout the course of these interrogations, were highly prejudicial to appellant and constitutionally inadmissible; these factors alone justify a reversal and remand for new trial. We feel constrained, however, to pass on two other noteworthy issues which are bound to arise again in the forthcoming new trial.

## II.

### CONSENT TO SEARCH

Cody contends secondly that the court erred in denying his motion to suppress evidence obtained as a result of the search of his hotel room in Las Vegas, on the grounds that said evidence was obtained in violation of his rights under the Fourth Amendment. A search of Cody's room at the Aladdin Hotel disclosed money that was eventually traced as belonging to Brown, in the amount of $53,950.00, consisting in part of one-thousand dollar and five-hundred dollar bills behind a metal kleenex dispenser in the bathroom. The search also uncovered a number of receipts from Omaha, Nebraska, hotel rooms and other business establishments, which resulted in the police officers tracing Cody's whereabouts to Omaha and in ultimately discovering boots and other articles of clothing bearing Brown's blood type. During the initial stages of the February 28 interview, Cody refused to sign a "consent to search" form without first discussing the matter with an attorney. Cody now contends that the fact that he first refused to give his consent invalidated his later consent, approximately four hours later.

Cody maintains that the law enforcement officers obtained his consent to search at a time in which no questioning should have been in progress, and that the consent to search was tainted by the *Miranda* violation. Furthermore, he contends that his consent was obtained through deceitful means employed by Tobias. Cody argues that Tobias misled him into believing a search warrant would be applied for and that after a purported "fugitive from justice speech," which suggested that the Aladdin Hotel would have the right to evict him and his property, he consented to the search. This so-called "fugitive from justice speech," however, appears nowhere in the record. We therefore decline to inject what bearing, if any, this purported colloquy would have in a determination of the voluntariness of appellant's consent to search.

Detective Santongue's version of how the consent was obtained is outlined in the suppression hearing transcript as follows:

> Originally Mr. Cody had refused and we merely said okay, and walked out. We came back and explained to Mr. Cody the problems of obtaining a nighttime search warrant in the State of Nevada and we explained to him that it would be difficult and it would expedite matters if he would sign the consent to search.

Cody was apprised of his rights and the form was read to him several times. At that time Cody mentioned there was something in the room that would incriminate him; when asked what it was, he responded, "narcotics." After Santongue assured him that *no criminal charges would be filed* against him with respect to any narcotics taken from the room pursuant to the search, he signed the consent to search form.[6]

▮ The fact that Cody initially refused to sign the consent to search without first consulting a lawyer does not automatically invalidate his later signing absent the presence of counsel. The validity of Cody's consent to search requires us only to determine whether his consent was voluntary.

▮ Voluntariness is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In determining voluntariness, there need not be a showing of a knowing and intelligent waiver or advice of a right to refuse to consent as appellant contends. The United States Supreme Court addressed this issue in *Schneckloth*:

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing either in the purposes behind requiring a "knowing" and "intelligent" waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

**6.** The consent to search form, dated February 28, 1978, read as follows:

> I, *William Robert Weeks, AKA Bill* Cody, AKA William Savage, having been informed of my legal right not to have a search made of the premises and/or property listed hereafter without a duly and authorized legal search warrant first having been issued by a competent court, and of my right to refuse to consent to such a search, I hereby authorize officers of the Las Vegas Metropolitan Police Department to conduct a search of the following:

*Id.* at 241, 93 S.Ct. at 2055, 36 L.Ed.2d at 871. The state must establish voluntariness by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied. *State v. Kissner*, 252 N.W.2d 330 (S.D.1977); *Gautreaux v. State*, 52 Wis.2d 489, 190 N.W.2d 542 (1971). Incarceration alone does not create the presumption that a consent to search is invalid or coerced as a matter of law. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Jordan*, 399 F.2d 610 (2nd Cir. 1968); *State v. Kissner*, supra.

*Gautreaux v. State*, supra, bears a somewhat analogous factual situation to the case at bar. There the defendant, after twice refusing to allow a search of his car, eventually signed a consent to search that resulted in the uncovering of a large amount of stolen money. The police had informed defendant that they could not search the car without his consent, that he would be better off if he consented to a search of the car, and if nothing were found, all the occupants would be released. The Wisconsin Supreme Court held that this was not a veiled threat which implied he would face a more serious charge if he did not consent or that the promise in and of itself destroyed the freedom of choice central to the concept of voluntariness. On the contrary, the Court concluded that:

> [T]he consent was not a product of any coercion but rather Charleston [defendant] chose to take a "calculated risk that the loot was well hidden and the possibility was the police would not find it by search of the vehicle." Taking a calculat-

Room number 1844, Aladdin Hotel, 3667 Las Vegas Blvd. South, Clark County Nevada, registered to William R. Savage

The officers are authorized by me to take from the above listed location any letters, papers, materials, and/or property for investigation purposes; and I have been advised that anything they take may be presented in a court as evidence. I further have been advised that I do not have to consent to this search and possible seizure, and have the right to have an attorney represent me at all stages of this investigation.

ed risk is a free choice and the circumstances of this case, especially the location where the loot was hidden, support the court's finding of the voluntariness of the consent and it will not be disturbed. *Id.* 52 Wis.2d at 494, 190 N.W.2d at 544.

Cody, by his own trial testimony, stated that he actually consented to the search because he did not feel that the police could possibly find the large amount of currency in the place where it was hidden. In other words, Cody took a calculated risk.

 The totality of the circumstances indicate that Cody's consent to search was freely and voluntarily given. The officers' assurances that he would not be prosecuted on any drug related charges if narcotics were found on the premises did not constitute implied coercion. The officers, by their own admission, imparted to Cody that they would have a great deal of difficulty in obtaining a search warrant at that time of night. Moreover, Cody admitted at the suppression hearing that no threats were made. Cody was fully advised of his rights and the possible consequences if incriminating evidence was found. This, according to the Eighth Circuit Court of Appeals, is an additional factor indicating that consent has been freely given. *United States v. Matthews*, 603 F.2d 48 (8th Cir. 1979). The fact that he earlier refused to consent to the search does not necessarily vitiate his later consent. *State v. Matthews*, supra; *Gautreaux v. State*, supra. Cody, having taken a calculated risk that the money would not be found, cannot now seek to rectify a bad choice by claiming that he was coerced into taking such a gamble.

### III.

### CONSTITUTIONALITY: STATUTES AND INSTRUCTION

Appellant also contends that SDCL 22–16–4 and SDCL 22–16–5[7] under which he was convicted for murder are unconstitutional in that the burden is shifted to a defendant to raise reasonable doubt as to the nonexistence of the element of a premeditated design, since by statute a premeditated design can be formed instantly and can be inferred from the act of killing. The constitutionality of these statutes was addressed by this Court in *State v. Nelson*, 272 N.W.2d 817 (S.D.1978), in which they were found to be constitutional. We find no reason to deviate from this position.

 Appellant also attacks the constitutionality of jury instruction No. 24 which states:

The term "premeditated design to effect the death" as used in the foregoing definition of murder means an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed.

A statute of this state provides that a premeditated design to effect death sufficient to constitute murder may be formed instantly *before committing the act by which it is carried into execution.* It is further provided that such design to effect death *may be inferred* from the fact of killing *unless the circumstances raise a reasonable doubt whether such design existed. Such an inference is nothing more than a permissible deduction* from the evidence *and it is for the jury to determine whether or not such an inference is to be made in view of all of the facts and circumstances shown.* (Emphasis added).

Appellant maintains that the instruction shifted to him the burden of disproving an element of the crime charged, in violation of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). We disagree. The instruction embodied not that of a conclusive or mandatory presumption, but merely that of a permissible inference from which the jury was at liberty to draw its own conclusion after considering all the evidence

---

**7.** SDCL 22–16–5 was amended by Sess.L.1978, ch. 158, § 8 which deleted: "Such design is inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed."

presented. *Cf. Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Adams v. State*, 92 Wis.2d 875, 289 N.W.2d 318 (1979). Although the state must prove every element of a criminal offense beyond a reasonable doubt, the instruction regarding a permissible inference does not violate due process as long as the evidence necessary to raise the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt. *County Court of Ulster County v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

The judgment of conviction is reversed and the case is remanded for new trial.

All the Justices concur.