**STATE of South Dakota, Plaintiff and Appellant,**

v.

**David HOLLAND, Defendant and Appellee.**

**No. 14195.**

Supreme Court of South Dakota.

Argued Jan. 18, 1984.

Decided March 14, 1984.

**304**

Jon R. Erickson, Asst. Atty. Gen., Pierre, for plaintiff and appellant; Mark V. Meier-henry, Atty. Gen., Pierre, Barbara Jo Anderson, Legal Intern, Pierre, on brief.

Thomas M. Tobin of Maynes, Tonner, Maynes & Tobin, Aberdeen, for defendant and appellee.

DUNN, Justice.

This is an appeal by the State from an order of the trial court suppressing certain evidence in a prosecution for second-degree murder and manslaughter. We affirm in part and reverse in part.

During the early morning hours of July 23, 1981, twenty-three-month old Joseph Lange (Joseph) was taken to the emergency room of an Aberdeen, South Dakota, hospital by David Holland (defendant). After several resuscitation attempts by hospital staff, Joseph was declared dead. Death was attributed to anoxia, although bruises to Joseph's face, back, and chest were also present. At the time of this incident, defendant was living with Joseph and Joseph's mother in an Aberdeen apartment.

While at the hospital, defendant was questioned by Aberdeen Police Captain L.C. Thompson (Thompson). Defendant told Thompson this version of what had happened: Defendant was awakened in the night by the sounds of choking, so he took Joseph into the bathroom to help him; in doing so, he bumped Joseph's head on the bathroom door. Defendant forced open Joseph's mouth and removed a piece of foam rubber that was choking the child, but defendant could not resuscitate him.

Defendant twice went back to the apartment with Thompson in an attempt to find the item upon which Joseph had been choking. On the second trip, Thompson gave defendant his *Miranda* warning and informed him that the case was being treated as a homicide. After the warning, while they were at the apartment, defendant demonstrated to Thompson what had occurred that evening. Defendant then told Thompson that he would say nothing more unless an attorney was present. The Aberdeen police detective, Glenn Imberi, who later assumed responsibility for the case, was told of defendant's request to remain silent unless an attorney was present and he arranged to conduct all interviews with defendant through defendant's attorney.

Before any charges were brought against him in South Dakota, defendant moved to Oregon. While there, defendant was charged with child abuse and was incarcerated in the Clatsop County Jail. During his time in the Oregon jail, defend-

ant was interviewed twice about the death of Joseph—once by Rick Lyle, a Clatsop County investigator, and once by Detective Imberi and South Dakota Assistant Attorney General Jon Erickson. Before both of these interviews, defendant was read the *Miranda* warning, but he did not speak with his South Dakota attorney.

Following these interviews, defendant was indicted by a Brown County, South Dakota, grand jury on two counts of second-degree murder, one count of first-degree manslaughter, and one count of second-degree manslaughter for the death of Joseph. A hearing was held before the trial court to determine the admissibility of certain evidence to be offered by the State. The trial court entered an order suppressing much of the evidence and State appeals that order.

State raises five issues on appeal: 1) Did the trial court err in suppressing statements made by defendant to investigators? 2) Did the trial court err in suppressing photographs of Joseph's body? 3) Did the trial court err by refusing to allow testimony concerning "battered child syndrome"? 4) Did the trial court err by suppressing evidence of prior acts by defendant? 5) Did the trial court err by failing to reopen the suppression hearing after making its ruling?

I

State's first contention is that defendant's statements to investigators should not have been suppressed by the trial court. State claims that before making the statements, defendant voluntarily waived his constitutional privilege against self-incrimination. U.S. Const. amend. V, XIV; S.D. Const. art. VI, § 9. Statements made by defendant in three separate interviews are at issue here: 1) the interview with Rick Lyle, an investigator with the Clatsop County District Attorney, in the Clatsop County Jail on November 17, 1982; 2) the interview with Aberdeen Police Detective Glenn Imberi and Assistant Attorney General Jon Erickson at the Clatsop County Jail on November 21, 1982; and 3) the

conversation with Thompson on the night of Joseph's death. State concedes that the two interviews in the Clatsop County Jail were custodial interrogations.

The United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), set forth the rule that the prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. One of these safeguards is the right to have an attorney present. A defendant can waive his privilege against self-incrimination and the rights that go along with it, provided that the waiver is made voluntarily, knowingly, and intelligently. *Miranda, supra.* To determine whether the waiver was made voluntarily, knowingly, and intelligently, we must look to the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *State v. Hartley*, 326 N.W.2d 226 (S.D.1982); *State v. Cody*, 293 N.W.2d 440 (S.D.1980). We must also consider whether the defendant knew of the nature of the offense for which he was charged or suspected. *Cody, supra.* State has a heavy burden of demonstrating beyond a reasonable doubt that defendant voluntarily and knowingly waived his rights, and the courts must indulge in every reasonable presumption against waiver. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Cody, supra.*

We deal first with defendant's interview with Rick Lyle in the Clatsop County Jail, where defendant was being held on Oregon child abuse charges. Lyle began the interview by reading the *Miranda* warning to defendant, followed by a short discussion of the Oregon charges. At the time of the warning, defendant stated he did not want an attorney present because he thought the Oregon charges were ridiculous and no attorney was needed. However, not long into the interview, Lyle ab-

ruptly and without warning changed the focus of the questioning from the Oregon child abuse charges to the South Dakota incident involving the death of Joseph. Lyle never restated the *Miranda* warning or asked defendant if he had an attorney in the South Dakota matter.

Under the circumstances of the abrupt change in focus of the interview, we find no voluntary or intelligent waiver by defendant of his rights. The record is clear that defendant waived his right to an attorney only for purposes of discussing the Oregon charges. When he waived his rights at that time, he never knew that the South Dakota incident would be raised. It is difficult to conceive how one can intelligently waive his right to counsel when he does not know the nature of the offense with which the major part of the interview will be concerned. *Cody, supra.* This finding is further buttressed by the fact that defendant had at all prior times chosen to speak about the South Dakota incident *only* in the presence of his attorney. State has failed to meet the heavy burden of showing an intelligent and knowing waiver of rights by defendant in the interview with Lyle concerning the death of Joseph.

■ We next consider defendant's interview with Imberi and Erickson, who were in Oregon ostensibly to interview defendant's wife. While there, they stopped at the Clatsop County Jail to speak with defendant. They advised defendant of his rights under *Miranda,* and defendant said he wanted to speak with his attorney. Erickson then proceeded to call the Oregon attorney who represented defendant on the Oregon child abuse charges. Defendant was allowed to speak with the attorney, but the attorney did not come to the jail to take part in the conversation. The South Dakota officers proceeded to question defendant.

We find that under the facts and circumstances of this second conversation, defendant did not knowingly or intelligently waive his rights. It is true that the officers afforded defendant an opportunity to speak with the Oregon attorney before they pro-

ceeded with the questioning, but this attorney later stated that he knew nothing of the South Dakota charges or that defendant had a South Dakota attorney. Thus it would have been impossible for the Oregon attorney to properly advise defendant concerning the death of Joseph. In addition, Imberi and Erickson knew that defendant had a South Dakota attorney, they knew there was a prior agreement that defendant would not speak unless his South Dakota attorney was present, they knew defendant had maintained silence before a South Dakota grand jury, and they knew that defendant is a man of "less than average intelligence." Still, they made no attempt to contact his South Dakota attorney, the one person who could adequately advise defendant with respect to the South Dakota proceedings. In light of these facts, State has failed to meet its heavy burden of showing a waiver of rights.

The third conversation at issue, which involved defendant and Thompson, occurred in Aberdeen on the night of Joseph's death. After receiving the *Miranda* warning, defendant demonstrated to Thompson what he had done to Joseph during the events of the evening. Unlike its findings as to the other two interviews, the trial court ruled, in its findings of fact and conclusions of law, that the conversation was admissible, since defendant had knowingly, intelligently, and voluntarily waived his rights. Defendant now maintains that the conversation and demonstration should be suppressed.

■ We refuse to consider defendant's claim, however, since he never raised the issue on notice of review as required by SDCL 15–26A–22. Failure to comply with the requirements of SDCL 15–26A–22 precludes this court from considering the issue. *Application of Northwestern Bell Tel. Co.,* 326 N.W.2d 100 (S.D.1982). In regard to this third conversation, we also note that any discrepancies between the trial court's memorandum decision (which said evidence of this conversation should be suppressed) and the findings of fact and conclusions of law must be resolved in fa-

vor of the latter. A memorandum decision is merely an expression of the trial court's opinion of the facts and law which has no binding effect on the judge or anyone else; the trial court can therefore rethink its memorandum decision. This court's review is limited to the findings of fact and conclusions of law. *Jones v. Jones*, 334 N.W.2d 492 (S.D.1983); *Hitzel v. Clark*, 334 N.W.2d 37 (S.D.1983).

## II

State's second contention is that the trial court abused its discretion by denying admission of photographs of Joseph's body. Specifically, the trial court suppressed photos of the deceased child's buttocks, right mid-section, and the right side of his face. The trial court stated that the photographs would merely tend to arouse the passion and prejudice of the jury. The trial court did not, however, suppress photographs of the upper torso and face or testimony from physicians describing bruises on the child's body.

It is well settled that photographs are admissible into evidence where they accurately portray anything which is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue. The photographs are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice. *State v. Huth*, 334 N.W.2d 485 (S.D. 1983); *State v. Rash*, 294 N.W.2d 416 (S.D. 1980); *State v. Disbrow*, 266 N.W.2d 246 (S.D.1978). Since the trial court ruled that medical testimony on the condition of the body is admissible, and since bruising is relevant to the issue of child abuse, we find that the trial court abused its discretion by suppressing the photographs.

## III

State's third contention is that the trial court erred by refusing to admit testimony of "battered child syndrome." Both physicians who performed autopsies on Joseph's body stated that they did not believe Joseph's death was intentionally caused or was a result of "battered child syndrome"; they did, however, report numerous bruises and abrasions which appeared to have occurred over a period of time. Dr. Thomas Henry noted approximately seventeen bruises on Joseph's body, not including those caused by medical cutdowns and resuscitation attempts. He concluded that the number of bruises cause "definite concerns that this child was in fact an abused child," and that failure to find evidence of a traumatic death does not mean Joseph was not an abused child. Because of this evidence, State intended to have Dr. Robert ten Bensel, a child abuse expert, testify concerning "battered child syndrome." The trial court rejected this testimony solely on the basis that there was no evidence of bone injury or of subdural hematomas with or without skull fractures; it stated that without such evidence, the six elements of "battered child syndrome" were not present.

In *State v. Best*, 89 S.D. 227, 232 N.W.2d 447 (1975), this court held that testimony concerning "battered child syndrome" was properly admissible in trial courts. "Battered child syndrome" is a conclusion, based on extensive study by medical science, that a child found with certain types of injuries has not suffered those injuries by accidental means. In *Best* we stated:

> There are several elements that are the criteria for the "battered child syndrome." They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect.

89 S.D. at 246, 232 N.W.2d at 458 (citation omitted). The question to be decided is whether all six of these "elements" must be present before testimony of "battered child syndrome" is admissible in trial court. We conclude that not all six need to be present.

First, we did not state in *Best* that all six elements are absolutely required before testimony of "battered child syndrome" is admissible. We did note in *Best*, as the court did in *People v. Jackson*, 18 Cal. App.3d 504, 95 Cal.Rptr. 919 (1971), that the six enumerated elements happened to be present in those cases.

Second, we find no authority from other jurisdictions requiring all six elements to be present before allowing testimony of "battered child syndrome." Of particular importance is authority from New York, California, and Minnesota, the three jurisdictions upon which we relied in *Best*. In *People v. Henson*, 33 N.Y.2d 63, 349 N.Y. S.2d 657, 665, 304 N.E.2d 358, 364 (1973), the court stated that "battered child syndrome" testimony is admissible when there is a finding that a child "exhibits evidence ... of subdural hematoma, multiple fractures in various stages of healing, soft tissue swellings *or* skin bruising." (Emphasis added.) The court in *People v. Ewing*, 72 Cal.App.3d 714, 140 Cal.Rptr. 299 (1977), ruled that "battered child syndrome" denotes repeated, sometimes serious, injuries inflicted over a span of time, with their nature, severity, and number being such as to preclude an inference of accident.

The Supreme Court of Minnesota has dealt with an entire series of battered child cases and provides guidance on this question. In *Schleret v. State*, 311 N.W.2d 843 (Minn.1981), the court held that symptoms needed to support a diagnosis of "battered child syndrome" are multiple, non-accidental injuries done to a child which are in various stages of healing.

Examples of such successive injuries include bruises, burns, and fractures. The child *need not* have suffered more than one of those successive injuries to permit

the diagnosis. The absence of burns and fractures, for example, does not mean that a repeatedly bruised child is any less a victim of "battered child syndrome."

311 N.W.2d at 844 (emphasis added).

 We must agree with the Minnesota Court that "battered child syndrome" can be present when any one of a number of injuries is inflicted upon a child. It would be absurd to hold that a child cannot suffer from battering merely because he has no bone fractures. Testimony concerning "battered child syndrome" should be admitted by a trial court when there is evidence of injuries inflicted upon a child over a span of time, when the nature of the injuries is such as to preclude accidental injury, and when the story given does not explain the injury. *See People v. Ewing*, *supra*, and *State v. Durfee*, 322 N.W.2d 778 (Minn.1982).

### IV

State's fourth contention is that the trial court erred by refusing to admit evidence of prior acts of defendant. The acts in question occurred sometime during the years of 1976–1978 in Billings, Montana, and involved the following circumstances: 1) defendant grabbed a two and one-half month old baby by the throat; 2) defendant intentionally choked his child and then hit him on the back, causing a bruise; and 3) defendant hit a one-week-old baby with his fists. State wants to offer evidence of these prior acts, pursuant to SDCL 19–12–5,[1] to prove absence of mistake or accident, opportunity, and identity of defendant as perpetrator of the alleged criminal act. The trial court excluded the evidence, stating that the probative value of the evidence is outweighed by the considerations of SDCL 19–12–3.[2]

---

**1.** SDCL 19–12–5 (Rule 404(b)) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

**2.** SDCL 19–12–3 (Rule 403) provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid-

■ The question of balancing the probative value of evidence admissible under SDCL 19–12–5 against the risk of unfair prejudice and the other SDCL 19–12–3 considerations is one for the trial judge to resolve in the sound exercise of his discretion. It is the duty of this court to determine whether there has been an abuse of that discretion. *State v. Johnson,* 316 N.W.2d 652 (S.D.1982); *State v. Houghton,* 272 N.W.2d 788 (S.D.1978). We agree with State that there has been an abuse of discretion in the present case.

The admissibility of evidence of other acts to establish intent and absence of mistake or accident is well established in child abuse cases. *United States v. Harris,* 661 F.2d 138 (10th Cir.1981), citing *United States v. Colvin,* 614 F.2d 44 (5th Cir.1980), *cert. denied* 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 802 (1980) and *United States v. Woods,* 484 F.2d 127 (4th Cir.1973), *cert. denied* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974); *United States v. Grady,* 481 F.2d 1106 (D.C.Cir.1973).

In addition, we recently stated that "prejudice" in SDCL 19–2–3 does not mean damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means. *State v. Iron Shell,* 336 N.W.2d 372 (S.D.1983); 22 C. Wright & K. Graham, Federal Practice and Procedure § 5215 (1978). Here, the evidence of prior abuse is not some collateral matter offered solely for prejudicial purposes. The evidence is directed at the vital issues of whether the injuries to Joseph could have happened by accident, as defendant maintains, and whether defendant can be identified as one who may have harmed the child. As such, the evidence may have an adverse impact on defendant's case, as does most evidence offered by State, but it does not persuade by illegitimate means. Therefore, we find that the value of the evidence is not outweighed by the considerations of SDCL 19–12–3.

V

■ State's fifth contention is that the trial court should have reopened the suppression hearing after making its rulings. Having carefully examined the record, we find no abuse of discretion by the trial court in this regard.

The order of the trial court is affirmed on the issues of waiver of rights under *Miranda* and reopening of the hearing; we reverse on the questions of admissibility of photographs, "battered child syndrome," and prior acts of the defendant.

FOSHEIM, C.J., and WOLLMAN and MORGAN, JJ., concur.

HENDERSON, J., specially concurs in part and dissents in part.

HENDERSON, Justice (specially concurring in part, dissenting in part).

## SPECIAL CONCURRENCE IN PART

There were thirty-one explicit Findings of Fact and seventeen Conclusions of Law formally entered herein upon which the trial court predicated its order of April 26, 1983, containing twelve specific paragraphs. This suppression motion was ably tried and decided.

I concur, in all matters, in this Court's decision to affirm the trial court's ruling on not reopening the suppression hearing, the Lyle interview in Oregon, the Imberi-Erickson interview in Oregon, and the Captain Thompson conversation-demonstration in Aberdeen.

Having served five years on this Court, I note from appellate records and take judicial notice thereof, of the deep involvement by the Attorney General's Office in investigating sensational criminal cases to such extent that certain Assistant Attorney Generals or Special Prosecutors place themselves in a position of being witnesses. Later, they argue and/or brief the cases on appeal. It becomes difficult to determine whether they act in the role of (1) witness,

erations of undue delay, waste of time, or need-

less presentation of cumulative evidence.

or (2) detective, or (3) trial counsel, or (4) appellate counsel. This dual and sometimes triple function has triggered ethical considerations, at least one major reversal in a homicide case begetting disciplinary action on file in this Court, and in this case finds counsel for the defense accusing the Assistant Attorney General of, out and out, talking to this client, full well knowing that the defendant was his client, and failing to honor the attorney-client relationship. For a case involving ethical considerations of a special prosecutor acting as an Assistant Attorney General, *see State v. Brandenburg,* 344 N.W.2d 702 (S.D.1984). Speaking in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court stated that the requests of defendant to have counsel present and to remain silent, once made, must be "scrupulously honored." Accord: *State v. Strickland,* 209 Neb. 133, 306 N.W.2d 600 (1981). Once an attorney is requested, the interrogation must cease (even if by and through the direction of an Assistant Attorney General) until an attorney is present and the individual has been given the right to confer with his requested attorney and to have the attorney present. *State v. Cody,* 293 N.W.2d 440 (S.D.1980). *See also* Code of Professional Responsibility, DR 7–104 COMMUNICATING WITH ONE OF ADVERSE INTEREST (A)(1), SDCL 16–18, Appx. Simply put, a practicing lawyer cannot contact another lawyer's client unless there is a consent. There was no consent in this case.

### DISSENT IN PART

#### –Battered Child Syndrome–

Calling to mind that the accused is charged with second-degree murder and manslaughter, and ever so mindful that this is not a criminal case charging the accused with child abuse, the appellate mind must focus on the showing of the State's two pathologists in this case. Dr. Henry and Dr. Sweeny stated that this was not a case of Battered Child Syndrome. Although I agree that the six "elements" of *Best,* 232 N.W.2d 447, are collectively too restrictive in scope, and do not disagree with this Court adopting a new standard in this state for future cases, nonetheless, I still could not reverse the trial court on its findings, conclusions, and order in this case. With two state pathologists expressing such expert medical opinions, and there being no evidence to the contrary, Finding of Fact XIII, XIV, and XV were highly pertinent to the trial court's decision to disallow the testimony of one Dr. Robert ten Bensel. Set forth below are said findings:

### XIII.

That on the 23rd day of July, 1981, at Rapid City, South Dakota, at 8:45 p.m. to 11:00 p.m., Dr. Thomas Henry, a forensic pathologist with ten (10) years of forensic pathology experience, performed an autopsy on the body of the deceased. That Dr. Henry is a forensic pathologist with experience in working for law enforcement agencies and for the Federal Bureau of Investigation and has testified regarding his findings in previous criminal matters. That Dr. Henry is qualified in investigating traumatic, accidental, and natural deaths that are sudden and unexpected and is informed about the Battered Child Syndrome and the deaths occurring therefrom. Dr. Henry further has experience in anoxia type deaths.

### XIV.

That bruises were present on the body of the deceased about the face, back and chest. That all of the bruises are superficial and when considered alone or together could not be the cause of death. That several bruises were old and not related to the events occurring the evening the child died.

### XV.

That the deceased had no history or present evidence of ever having any broken bones, nor any skull fractures or damage to the skull at all.

The majority opinion recognizes, and rightly so, that the cause of death was attributed to anoxia. A fair import of the findings was that the cause of death was not by trauma. Faced with expert medical opinion, the trial court apparently felt compelled under the state of the record to enter the Findings of Fact and Conclusions of Law that it did. Our review is pursuant to *Best.* Did the court, within its discretionary powers, err by suppressing the evidence of Dr. ten Bensel? Under the state of the record, I am not prepared to say so. If there was evidence establishing a traumatic death with the cause of death related to the Battered Child Syndrome, obviously I would reach an opposite conclusion. Generally, the evidence gathered to prove child abuse is circumstantial. When in the course of this murder-manslaughter prosecution, the State must prove cause of death, said causation must be established within a reasonable medical certainty. The burden of proof will be upon the State of South Dakota to come forward with scientific and medical proof to establish that the child died as a result of trauma. At such point in time of proof, the State will not be able to rest on circumstantial evidence of child abuse to establish cause of death. The trial court was faced with statements by forensic pathologists who would not attribute death to trauma. Dr. Henry pointed out that he found "no evidence in this case that force was used in effecting this death and finds no evidence that would lead one to believe that this death was intentionally effected." An anoxia-caused death, inflicted by a lay person, would have left evidence readily seen by the trained eye and mind of the pathologists. Again, I point out that the criminal charge herein is not child abuse, it is murder-manslaughter. The trial judge, a servant on the Bench for decades, labored and surely anguished over this decision, as I likewise do by this writing. It is rudimentary, that as lawyers and judges, we must decide cases by the evidence.

–Photographs–

Upon suppression of testimony concerning "Battered Child Syndrome," expert testimony was necessarily restricted to the immediate circumstances surrounding cause of death.

Five separate findings of fact were entered with respect to five enlarged color photographs. The trial court declared three admissible, per Finding of Fact XI, XII, and XIII, because they would "aid in the verbal description of the attending physicians." Regarding the remaining two photographs, per Finding of Fact XIV and XV, the trial court did not find that these photographs would "aid in the verbal description of the attending physicians." With reference to the latter, the trial court thus concluded that it would arouse the passion and prejudice of the jury. Implicit in the trial court's ruling is that, inasmuch as they did not aid in a verbal description, basically they simply were not relevant. There must first be a threshold finding of relevancy and the trial court made no such finding. *State v. Disbrow*, 266 N.W.2d 246, 253 (S.D.1978). The two excluded photographs must be relevant to the cause of death giving rise to a murder-manslaughter charge. They were not. Their relevancy rested solely in their implications of child abuse. "Anoxia," the pathologists' findings as to death causation, is an "absence or lack of oxygen," a "reduction of oxygen in body tissue below physiologic levels." *Dorland's Illustrated Medical Dictionary* 101 (25th ed. 1974). Marks on the body not related to the cause of death, bruises on the body which do not aid in the verbal description of the attending physicians (Drs. Brown and Primrose) cannot and should not be paraded before a jury, persuading by illegitimate means, to achieve a conviction-oriented result. These pictures were outside the restricted scope of testimony. With marginal relevancy, at best, the potential for unnecessary incitement and prejudice would far outweigh the tenuous connection to the issues.

I do not argue with the rule that photographs are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice. *State v. Huth*, 334 N.W.2d 485 (S.D.1983). However, "[i]t is

generally understood that the trial court, in determining whether pictures or photographs should be admitted, must weigh the probative value of the photographs in resolving a material issue as against the danger of prejudice to the appellant through needless arousal of the passions of the jurors." *State v. Kane,* 266 N.W.2d 552, 558 (S.D.1978). Child abuse, or Battered Child Syndrome, was not in issue, because the trial court had ruled that this was not a Battered Child Syndrome case, based upon the State's medical experts. The trial court viewed these 7″ × 11″ color photographs, took into consideration the medical expertise available, considered the impact upon the jury, and ruled accordingly. I note that the defendant moved to suppress all five of the enlargements but there was no appeal taken from the admission of three enlargements by the defendant. Under *Kane,* 266 N.W.2d 552, I would affirm the trial court on this issue.

–Prior Acts–

Reference is made to my dissents in *State v. Iron Shell,* 336 N.W.2d 372, 375 (S.D.1983) and *State v. Wedemann,* 339 N.W.2d 112, 116 (S.D.1983). Following those dissents, and applying the facts as found by the trial court in this case, I cannot say that the trial court abused its discretion.

First, this Court adopted the federal requirement that the prior crimes, wrongs, or acts must have occurred close in time to the act at bar. *State v. Pedde,* 334 N.W.2d 41 (S.D.1983); *State v. Johnson,* 316 N.W.2d 652 (S.D.1982). The three Billings, Montana incidents transpired six and seven years prior to the facts giving rise to this prosecution. Therefore, it is not a "close in time" situation. Rather, it is factually remote.

Second, in section IV of the majority decision, the "facts" as depicted are overwhelmingly different than the Findings of Fact formally entered by the trial court. We must defer to the trial court as it found the facts. Reference is made to Findings of Fact XVI, XXVII, XXVIII, and XXIX. I can absolutely find no Findings of Fact

remotely resembling grabbing a two-and-a-half-month-old baby by the throat or striking a one-week-old baby with his fists.

Third, our standard of review is whether the trial court abused its discretion in admitting the evidence (or rejecting it). *State v. Houghton,* 272 N.W.2d 788 (S.D.1978). In that review "we are bound by the rule that the question is 'not whether the judges of this court would have made an original like ruling, but rather whether we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion.'" *State v. Rose,* 324 N.W.2d 894, 895–96 (S.D.1982).

There was a paled probative force to the offered Billings, Montana proof. Each factual scenario set in Billings, Montana, some six and seven years prior to the Aberdeen, South Dakota factual scenario was keenly addressed by the trial court. Each scenario would, purportedly, be testified to by one Jesse Holland. One scenario was not witnessed by Jesse Holland. Another scenario involved the defendant grabbing his two-month-old child by one arm. Another scenario involves the accused spanking his child twice on the bottom. All three of these factual instances will, purportedly, be presented to the jury to show an absence of mistake or absence of accident concerning the present murder-manslaughter charge. Collateral issues, arising from these three factual scenarios, will be presented to the jury and will amount to a trial not on the merits of this action. In my dissent in *Wedemann,* 339 N.W.2d at 118, I posed this question: "Where will the boundless, amorphous majority rule end?" I am opposed to opening the door to virtually any act that might be remotely connected with any activity of which the accused might be charged. This Court has set on a course of broadening the scope of SDCL 19–12–5 far beyond the intent of the Advisory Committee of the Federal Rules of Evidence.