**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Donald WIEGERS, Defendant
and Appellant.**

No. 14304.

Supreme Court of South Dakota.

Argued April 18, 1984.

Decided July 31, 1985.

Mark Smith, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Kenn A. Pugh, Northern Hills Public Defender, Deadwood, for defendant and appellant.

WOLLMAN, Justice.

Defendant appeals from his conviction by a Brule County jury of two counts of conspiracy to commit premeditated murder and of the lesser included offense of manslaughter in the second degree.[1] We affirm in part and remand in part.

The charges against defendant arose out of the killing of Russell Keller of Deadwood on October 22, 1981. On January 28, 1983, a Lawrence County grand jury returned an indictment charging defendant as follows:

[T]hat Donald Wiegers did:

Ct.I: CONSPIRACY TO COMMIT PREMEDITATED MURDER:

Willfully, unlawfully and feloniously, between the months of March and November, 1981, conspire with Timothy J. Holmes, to commit the offense of premeditated murder, an offense against the State of South Dakota, and that said Timothy J. Holmes, did the following overt acts, to-wit: Timothy J. Holmes, did, with the intent to effect the death of Russell Keller, lure and entice said Russell Keller to the Pahasapa Campground located in Lawrence County, South Dakota. Contrary to SDCL 22–3–8.

Ct.II: CONSPIRACY TO COMMIT PREMEDITATED MURDER:

Willfully, unlawfully and feloniously, between the months of March and November, 1981, conspire with Scott Whitesell and David Waff, to commit the offense of premeditated murder, an offense against the State of South Dakota, and that David Waff did the following overt acts, to-wit: David Waff did, on or about the 22nd day of October, 1981, without authority of law, perpetrate and with a premeditated design to effect the death of the person killed, kill Russell Keller in Lawrence County, South Dakota. Contrary to SDCL 22–3–8.

Ct.III: PREMEDITATED MURDER:

Willfully, unlawfully and feloniously on or about the 22nd day of October, 1981, without authority of law, perpetrate and with a premeditated design to effect the death of the person killed, kill Russell Keller. Contrary to SDCL 22–16–4 and 22–3–3.

Keller and Melvin Brown, who was the stepfather of Keller's wife, were partners in a business in Deadwood known as B & K Wrecker Service. In early 1981, Brown called Keith Iwan, whom he had known for some sixteen or seventeen years, and asked whether Iwan knew of anyone who could perform a murder. Iwan in turn called defendant, whom Iwan had known for fifteen to seventeen years, at his appliance store in Rapid City and told defendant that he, Iwan, had a man who "wanted someone knocked off," and then asked defendant if he was interested. Defendant replied that he would get back to Iwan. Within two weeks defendant informed Iwan that the job could be done and that he wanted $2,500 for it. Iwan then called Brown, who told Iwan that he would give him $1,500 at the outset and "the rest when it was over with." Sometime in April or May of 1981, Brown brought $1,500 in cash to Rapid City and gave it to Iwan, along with a picture of Russell Keller and a telephone number. Iwan kept $1,000 for himself and gave defendant $500, along with the picture and telephone number.

---

**1.** Venue was changed from Lawrence County to Brule County.

In the meantime, defendant had contacted Timothy Holmes to determine whether Holmes was interested in performing the murder. After Holmes agreed that he would do the job, defendant gave him $500, a picture of Keller, and a sawed-off shotgun. Defendant also suggested to Holmes that the best way to set up the killing would be to call Keller out on a fake wrecker call.

Some two weeks later, Holmes, who had made some repairs on the shotgun, accompanied by one Chuck Kirschenmann, whom Holmes had bailed out of jail with some of the money he had received from defendant, set up an ambush near a Girl Scout camp in the Black Hills. When Keller arrived at the scene in response to a fake wrecker call, however, Holmes could not go through with the killing.

Two or three weeks later, after discussing the matter with defendant, Holmes again set up another ambush for Keller. Armed with a .44 caliber handgun, Holmes lay in wait while Keller responded to the fake wrecker call. Again, however, Holmes made no attempt to kill Keller when Keller appeared on the scene.

After calling Iwan a half dozen times to inquire why the murder had not been committed, Brown finally demanded the return of his money. Iwan in turn asked defendant to return the $500. Defendant repaid Iwan out of his own funds, telling Iwan that Holmes "had stiffed him [defendant] for $500." Iwan then returned the $1,500 to Brown in late June or early July of 1981.

In September of 1981, defendant called Iwan saying that he had a man who would do the job and that Iwan should get the money again. Iwan then called Brown and told him that it would cost a total of $3,000 to have Keller killed. Brown then met Iwan in Rapid City and gave him $2,000, with the understanding that the balance of $1,000 would be paid after Keller had been killed. A day or two later Iwan called defendant and told him that he had obtained the money, to which defendant replied, "Okay, we'll go ahead."

Defendant had contacted Scott Whitesell in April or May of 1981 to determine whether Whitesell was interested in performing the murder. Whitesell had been selling stolen guns and television sets to defendant for approximately two years in order to obtain money to support his drug habit. Whitesell contacted David Waff, his principal drug supplier, about performing the murder. Waff said that he was not interested in doing the job. Sometime later, however, Waff asked Whitesell if Whitesell's friend still wanted someone killed. Whitesell in turn inquired of defendant whether he still wanted the person killed, to which defendant replied in the affirmative. Defendant then told Whitesell that it was Russell Keller who was to be killed and that the price to be paid was $2,000. Defendant gave Keller's business and home phone numbers to Whitesell, offered a gun to be used, and suggested that the person who was to perform the murder should call Keller out on a wrecker call in a secluded area, shoot him, and then "plant a bag of bad grass on him." Whitesell passed this information on to Waff. A week or so later Waff told Whitesell that he had gone up to check the area where Keller might be killed. Waff also told Whitesell that he needed some money because he was broke. Whitesell then went to defendant's appliance store and obtained $1,000 from defendant, which Whitesell gave to Waff. Waff in turn gave $500 of the money back to Whitesell. In addition to the $500 that he received from Waff, Whitesell received from defendant a power booster, some speaker wire, and a discount on a stereo for Whitesell's part in the planned murder.

At some point during his conversations with Whitesell, Waff showed Whitesell a .25 caliber pistol. He also showed Whitesell a bullet, on the tip of which he had inscribed an "x," with the explanation that the bullet would explode upon impact and would therefore be untraceable.

Waff also told Whitesell that he had called Keller to the scene of the planned murder but that Brown had appeared in Keller's place. The two men discussed the

planned killing, with Brown telling Waff that a good day to commit the murder would be at a time when Brown and his wife were out of town. Brown and Waff then agreed upon a suitable date.

With respect to this last incident, Iwan testified that Brown had called him approximately ten days before Keller was killed and told him that he had responded to Waff's call because Keller's wrecker truck had broken down. Brown also told Iwan that when he arrived at the scene of Waff's allegedly disabled van he called out that he was Mel Brown and then had a conversation with Waff. Brown told Iwan to deliver $1,000 because he was confident that the job would be done. Iwan then gave defendant $1,000 with instructions to pass the money on to the persons who were to commit the murder, to which defendant replied that he had been told that those persons were to receive $1,000.

At approximately 8:00 p.m., October 21, 1981, Mrs. Russell Keller answered a telephone call at their residence. The caller requested that a wrecker be sent to the location of his disabled vehicle, some two miles outside Rochford. Mrs. Keller gave the phone to her husband, who then talked to the caller. Russell Keller then went out on the call, never to return.

On the morning of October 23, 1981, law enforcement officers found Keller's wrecker parked on Highway 385 approximately 19 miles south of Deadwood. There were blood stains on the highway behind the vehicle. Following drag marks and blood stains, the investigating officers discovered Keller's body lying in a wooded area some 200 feet from the wrecker. Keller had been shot once in the head from a distance of less than six inches and also had been stabbed eight times in the chest and abdomen. A forensic pathologist testified that either the gunshot wound or the stab wounds could have been sufficient to cause death.

On October 23, 1981, Waff told Whitesell that he had killed Keller by shooting him in the head and that he had dragged Keller's body into the ditch. Waff asked Whitesell for the remainder of his payment. Whitesell in turn contacted defendant. Defendant contacted Iwan, asking for the rest of the money. Iwan gave $1,000 to defendant, who later gave it to Whitesell. Whitesell in turn delivered the money to Waff.

A .25 caliber bullet with an "x" inscribed on the tip was removed from Keller's skull during the autopsy. A spent cartridge was found on the roadway behind Keller's vehicle. The bullet and cartridge were identified as having been fired from a .25 caliber pistol that Waff had pawned at a gun shop in Rapid City on November 6, 1981.

Whitesell, who was only some 20 years of age at the time this case was tried in June and July of 1983, had had a long history of drug and alcohol abuse, starting when he was yet in junior high school. In December of 1981 he admitted himself to an alcohol treatment facility, where he ultimately told his counselors about his involvement in the murder of Keller. Whitesell was later charged with conspiracy to commit premeditated murder and with premeditated murder. Following his testimony before a grand jury, Whitesell entered into a plea agreement with the State, under the terms of which he entered a plea of guilty to a charge of first-degree manslaughter with the understanding that the State would recommend that he receive no more than forty years and no less than thirty years in the state penitentiary. At the time of trial in the instant case, Whitesell's guilty plea had not yet been formally accepted by the court, and Whitesell still stood charged with the counts of conspiracy to commit murder and murder.

Iwan was granted immunity in exchange for his testimony at trial. Holmes was granted use immunity in exchange for his testimony at trial.

Melvin Brown committed suicide in the Lawrence County jail in May of 1982 after being placed in protective custody at his own request.

On August 3, 1983, a jury found Waff guilty of conspiracy to commit murder in the first degree and of first-degree murder

based upon charges arising out of Keller's death. We have this day affirmed those convictions. *State v. Waff,* 373 N.W.2d 18 (S.D.1985).

Defendant's account of the events that led to the charges against him was that he had purchased five or six guns from Whitesell in 1981. He also acknowledged that he had purchased a ring from Whitesell and testified that he had traded an in-dash automobile stereo system, a set of speakers, and some speaker wire to Whitesell for an automatic rifle. Defendant also acknowledged purchasing a used television set from Whitesell.

Defendant acknowledged that in late January or early February of 1981 Iwan had asked him if he knew of anyone who would be interested in killing someone for money. Defendant testified that he thought that Iwan was joking and that he had then told Iwan that he knew of no one who would do this. Defendant testified that some two weeks later Iwan again brought up the subject of a contract killing, to which defendant replied that he did not know of anyone who did those things.

Upon defendant's return from a vacation trip to Mexico in late March of 1981, Iwan again asked defendant if he had given any more thought to the matter of the contract killing, to which defendant replied in the negative. Defendant testified that in early April of 1981 Iwan and he had a conversation at the appliance store during which Iwan handed defendant a sealed white envelope and asked that he give it to Holmes the next time that Holmes came to the store. Defendant delivered the envelope to Holmes either that same evening or the next morning.

Defendant also testified that sometime in February of 1981 a truck driver who was en route to Wisconsin stopped at defendant's appliance store to have his C.B. radio repaired. Holmes was present at the time, and in the presence of defendant and Holmes the truck driver, in defendant's words, "[D]id bring up a similar offer like Keith Iwan brought up. However, this offer was like he said a $50,000 deal."

Defendant testified that the truck driver stopped to pick up his C.B. radio several days later and told defendant that he would stop by in a couple of weeks to see defendant. Defendant replied that he would be down in Mexico. Defendant testified that upon his return from Mexico one of his employees told him that a man who fit the description of the trucker had stopped and left an envelope for defendant. Within the envelope were five one hundred dollar bills and a twenty dollar bill. Defendant testified that he placed the envelope and money in his safe, where they remained until August or September of 1982, when defendant turned them over to the then Lawrence County State's Attorney at the latter's request and at the advice of defendant's then attorney, Randall Connelly.

With respect to the sawed-off shotgun that Holmes testified defendant had given him to use in killing Keller, defendant testified that he had acquired the shotgun in the fall of 1980 by trading a used C.B. radio for it. Defendant then placed the shotgun, which was in very poor condition, in the back room of his appliance store, where it remained until April or May of 1981. At that time Holmes told defendant that he, Holmes, wanted to take the shotgun home and repair it. Holmes kept the shotgun until sometime in June of 1981, when he returned it to defendant saying that he could not get it fixed.

## ISSUES

Defendant's initial brief raises five issues. We will discuss them in the order presented.

### I.

*Intimidation of Defense Witnesses*

After a recess for the three-day Independence Day holiday weekend, the trial resumed on Tuesday, July 5, 1983, with the defense continuing with its witnesses. That afternoon, defense counsel called one Pete Helmey to the stand. In response to defense counsel's question whether Helmey recalled talking to defense counsel on the

telephone on Saturday, July 2, Helmey, on the advice of his attorney, who had been appointed by the court that same afternoon, declined to answer on the ground that his answer might incriminate him. There then followed a hearing out of the presence of the jury during which defense counsel informed the court that he had received a telephone call from Helmey's wife on Friday night, July 1, which caused defense counsel to call Helmey on Saturday morning. Helmey told defense counsel that Whitesell, who had been returned to the Lawrence County jail on Friday evening, had said after watching the news on television, "I lied about him on the witness stand and hung the son of a bitch." Helmey then informed defense counsel that he had two other witnesses in the jail who had heard the same statement. Defense counsel then held separate telephone conversations with these two persons, Dave Ventling and Mike Downen, who both informed him that they had heard Whitesell say, "I lied about him on the witness stand and I'm going to hang the son of a bitch." Defense counsel then subpoenaed Helmey, Ventling, and Downen as defense witnesses.

Defense counsel then informed the trial court that he had learned from Ventling on July 5 that after the subpoenas had been served on the three in the Lawrence County jail Helmey had received a call from someone whom Helmey referred to as "Jeff," following which a jailer came and took Helmey from his cell. Ventling testified that he was taken downstairs, where he talked to Deputy Russell, who read Ventling his *Miranda* rights and then asked him "what was going on up there." Ventling replied, "Dwane, really I don't—I just don't know anything." Ventling was taken back upstairs and placed in the drunk tank with Helmey. Ventling was later taken back downstairs, where he was interviewed by Agent Litschewski of the State Division of Criminal Investigation. During cross-examination by the deputy state's attorney regarding what he had been told about perjury, Ventling testified:

They said that if I get on the stand and lied—with my other sentence I get out tomorrow, and that being on probation, if I was charged and convicted of perjury—and I says, "That's lying on the stand." And he said, "Yes." And he says if I'm tried and convicted of perjury, he said, "You'll spend 15 years down at Sioux Falls plus another five that you're on probation."

In response to the deputy state's attorney's question about what he had heard Whitesell say about lying at the trial, Ventling replied, "Honestly, I didn't hear a thing. The only thing that I—I just heard something in the background where he said something, but I couldn't make out what he said. I can't sit here on this stand and say I heard anything."

Defense counsel then called Downen to the stand. Although Downen denied hearing Whitesell make any statement on Friday night, July 1, he admitted that he had told defense counsel that he had heard Whitesell make a statement. Downen testified that after he was served with a subpoena he was interviewed by Deputy Russell in the sheriff's office. Downen exercised his constitutional right not to make any statement, after which he was sent back upstairs and placed in the drunk tank with Helmey and Ventling. After discussing with Helmey and Ventling what had happened to them, Downen asked the jailer to take him back downstairs so that he could again speak with Deputy Russell. Downen then told Russell that it was not true that Whitesell had made any statement in front of the television set regarding the fact that he had lied on the stand concerning defendant. Downen testified that he had told defense counsel that he had heard such a statement only because Helmey and Ventling had asked him to do so, based upon their opinion that defendant was not guilty. Downen testified that Russell had advised him that making a false statement on the witness stand was perjury and "that it normally carried an equal sentence as to the person being tried." Defense counsel then asked, "For instance, you could get life, is that—," to which

Downen answered, "Right, that's what he told me."

At the conclusion of the in-camera hearing, the trial court denied defendant's motion for a mistrial based upon his claim that the State had interfered with and intimidated his witnesses.

South Dakota Constitution, Article VI, § 7 provides:

In all criminal prosecutions the accused shall have the right to defend in person and by counsel; to demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face; to have compulsory process served for obtaining witnesses in his behalf, and to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

In discussing the right to compulsory process for obtaining witnesses guaranteed by the Sixth Amendment to the United States Constitution, the United States Supreme Court has held:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967).

In *Webb v. Texas*, 409 U.S. 95, 95–96, 93 S.Ct. 351, 352, 34 L.Ed.2d 330, 332 (1972), the trial court had admonished the defendant's only witness as follows:

"Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you.

If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking."

In responding to the claim that the defendant's Sixth Amendment rights, as guaranteed by the Fourteenth Amendment to the United States Constitution, had been violated, the United States Supreme Court, in a per curiam opinion, held:

In the circumstances of this case, we conclude that the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment. The admonition by the Texas Court of Criminal Appeals might well have given the trial judge guidance for future cases, but it did not serve to repair the infringement of the petitioner's due process rights under the Fourteenth Amendment.

*Id.* 409 U.S. at 98, 93 S.Ct. at 353–54, 34 L.Ed.2d at 333.

In *United States v. Morrison*, 535 F.2d 223 (3rd Cir.1976), the prosecutor on at least three occasions sent messages to a defense witness through defense counsel warning the witness that she was liable to

be prosecuted on drug charges, that any testimony she gave would be used as evidence against her, and that because she had turned eighteen it would be possible to bring federal perjury charges against her. The prosecutor also subpoenaed the potential witness to appear before him in his office, where, in the presence of the three undercover agents whose testimony the witness would contradict, advised her that if she testified falsely she could subject herself to a perjury charge. When the witness was called to the stand the following morning, she refused to answer some thirty questions on the ground that the answers might incriminate her. Citing the *Washington* and *Webb* cases, the Court of Appeals for the Third Circuit held that in view of the fact that the trial court had indicated on the first day of trial that it would warn the defense witness of her right against self-incrimination:

> The actions of [the prosecutor] were totally unnecessary. Ms. Bell could have made a knowing choice of whether to testify or not on the basis of the formal warning from the court. The pressure brought to bear on her by the Assistant United States Attorney interfered with the voluntariness of her choice and infringed defendant's constitutional right to have her freely-given testimony.
>
> This case seems clearly ruled by *Webb*. True, it was the trial judge in that case who "effectively drove that [the defendant's] witness off the stand." 409 U.S. at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333. Here, it was the influence of the Assistant United States Attorney, ..., a figure somewhat lower in the hierarchy than the trial judge but nonetheless the symbol of the Government's power to prosecute offenders. However good the trial judge found the intentions of [the prosecutor], his bizarre conduct toward a witness for the defense is not to be condoned. It was without doubt responsible for the course pursued by Sally Bell in refusing to testify and to that extent deprived Mr. Boscia of due process of law under the Fourteenth Amendment. Under such circumstances the order of

the United States District Court for the Western District of Pennsylvania filed August 12, 1975 denying the motion for a new trial will be reversed.

*Id.* at 228.

In order to ensure that the defendant be afforded a fair trial on remand, the Court of Appeals directed that a judgment of acquittal be entered unless the government requested use immunity for the witness's testimony in the event she was called to the stand and invoked her Fifth Amendment right not to testify. *Id.* at 229.

In *United States v. Thomas*, 488 F.2d 334 (6th Cir.1973), an acquitted codefendant who had been called as a witness by the remaining defendants was approached during a recess by a secret service agent at the request of the prosecutor. The agent told the witness that he would be prosecuted for misprison of a felony if he testified in the case. The witness later indicated that he would testify only under subpoena, which was not requested. The Court of Appeals for the Sixth Circuit, citing *Washington* and *Webb*, held that the government's action had substantially interfered with the witness's free and unhampered determination whether to testify and also interfered with the content of such testimony.

In *State v. Ammons*, 208 Neb. 797, 305 N.W.2d 808 (1981), a witness who had admitted to the prosecutor that it was he who had committed the robbery with which the defendant was being charged refused to testify after the prosecutor refused to comply with the terms of a plea bargain under which the witness had pleaded guilty to an assault charge and informed the witness that if he testified charges would be filed against him. The Supreme Court of Nebraska reversed the defendant's conviction, holding that he had been clearly prejudiced by the state's interference with his Sixth Amendment right to compulsory process as established in *Washington*.

In *People v. Pena*, 383 Mich. 402, 175 N.W.2d 767 (1970), the prosecuting attorney sent a letter written on official station-

ery to defendant's alibi witnesses, informing them of elements of the offense of perjury and the possible penalties upon being convicted of perjury. In reversing the defendant's conviction, the Supreme Court of Michigan stated:

> The Constitutional right of a defendant to call witnesses in his defense mandates that they must be called without intimidation. The manner of testifying is often more persuasive than the testimony itself.
>
> A prosecutor may impeach a witness in court but he may not intimidate him—in or out of court.

*Id.* 383 Mich. at 406, 175 N.W.2d at 768 (footnote omitted).

Although not reversing the conviction in the case before it because it concluded that the defendant had not been prejudiced by the State's misconduct in improperly threatening defense witnesses with criminal prosecution, the Supreme Court of Iowa accepted the rationale of the *Pena* case in *State v. Ivy,* 300 N.W.2d 310 (Iowa 1981).

■ In addition to the conferring upon a defendant the right to call witnesses on his behalf, South Dakota Constitution Article VI, § 7, also guarantees a defendant the right to impeach the state's key witnesses by showing bias on their part. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. Layton,* 337 N.W.2d 809 (S.D.1983); *State v. Volk,* 331 N.W.2d 67 (S.D.1983); *State v. Wounded Head,* 305 N.W.2d 677 (S.D.1981). Whitesell's testimony was essential to satisfy the State's burden of proof on Count I and was powerful evidence with respect to Count III. He was clearly a crucial witness on those counts. Accordingly, defendant should have been given great latitude in seeking to impeach his testimony.

■ Likewise, the common law rules of evidence, and, we conclude, our court-adopted rules of evidence, *see, e.g.,* SDCL 19–12–1; 19–12–2; 19–14–8; 19–14–9; 19–14–10; and 19–14–19, permit a party to impeach a witness by showing his bias.

*United States v. Abel,* — U.S. —, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *State v. Volk, supra; State v. Wounded Head, supra; State v. Goff,* 79 S.D. 138, 109 N.W.2d 256 (1961); *State v. Kenstler,* 44 S.D. 446, 184 N.W. 259 (1921). This does not mean, of course, that there are no restrictions on the type of evidence that a defendant may use to impeach a witness, for impeachment evidence must also satisfy the general test of admissibility. The testimony of Helmey, Ventling, and Downen regarding Whitesell's alleged jail-cell statement would have satisfied this test.

■ We conclude that there is a serious question whether defendant's right to call witnesses on his own behalf and to confront the witnesses against him as guaranteed to him by South Dakota Constitution Article VI, § 7, was violated by the State's threats to bring perjury charges against Helmey, Ventling, and Downen if they testified regarding the statement that they allegedly heard Whitesell make in the Lawrence County jail on the evening of July 1.

■ Although we are satisfied that defendant has made out a prima facie claim that the State interfered with his right to call witnesses on his behalf, we conclude that outright reversal is not necessary. We reach this conclusion because it may very well be that Ventling's and Downen's testimony during the in-camera hearing on July 5 persuaded the trial court that their earlier statements to defense counsel were nothing more than fabrications induced by Helmey's desire to aid Whitesell. *Cf. Marshall v. State,* 305 N.W.2d 838 (S.D.1981); *Pickering v. State,* 260 N.W.2d 234 (S.D. 1977). Likewise, it may very well be that Helmey, had he not exercised his right against self-incrimination, would likewise have voluntarily recanted the statement that he had made to defense counsel concerning Whitesell's statement. Accordingly, we will remand the case with directions that the trial court hold a hearing and then enter specific findings of fact and conclusions of law with respect to the proposed testimony of Helmey, Ventling, and Downen. The State will bear the burden of

establishing that its conduct was not the cause of Helmey's refusal to testify or of Ventling's and Downen's recantations. If the trial court finds that the three witnesses voluntarily recanted their earlier statements, the convictions on Count II and of second-degree manslaughter will be affirmed. Otherwise, the trial court is directed to grant a new trial with respect to those convictions.[2]

■ We are aware that the procedure we have outlined is unorthodox and perhaps without precedent in this state. If the State chooses to interfere with a defendant's constitutional right to call witnesses, however, then it must be prepared to live with the consequences of that course of action. We would remind prosecutors that it is the jury's function—not the prosecutor's—to determine the credibility of witnesses. *Washington v. Texas, supra.* The prosecutor should be content to subject the testimony of defense witnesses to the crucible of the courtroom. It is the prosecutor's duty "not simply to prosecute, but to obtain justice with a fair trial." *State v. Brandenburg,* 344 N.W.2d 702, 705 (S.D.1984).

## II.

### Ineffective Assistance of Counsel Claim

Defendant claims that he was denied his constitutional right to the effective assistance of counsel by reason of his counsel's failure to make a pretrial motion to suppress the statements that defendant made to agents of the State in Spokane, Washington. We agree.

Defendant was arrested in Spokane on a federal charge of unlawful flight to avoid prosecution following the return of the indictment by the grand jury. At 12:17 a.m., January 30, 1983, Deputy Sheriff Dwane Russell, Lawrence County State's Attorney Roger Tellinghuisen, and Lawrence County Deputy State's Attorney Jeffry Bloomberg

interrogated defendant in the sheriff's office in Spokane. The interrogation was recorded by means of a tape recording. In response to defense counsel's motion for discovery, the State filed a written disclosure on March 2, 1983, that stated in part:

> That the State has no written statements of the Defendant within it's [sic] possession, custody or control relating to the above-entitled matter. With respect to recorded statements, the State has in it's [sic] possession a tape recorded interview of the defendant made during an interview of the Defendant while in Spokane, Washington, which the Defendant or his counsel will be permitted to listen to at the Lawerence County Sheriff's Office.

On April 1, 1983, the State served upon defense counsel a memorandum that stated in part:

> That the State has within it's [sic] possession the tape recorded statement made by the Defendant on January 30, 1983 and the same is available for review by the Defendant or his counsel. A copy of the transcription of said tape is attached hereto and hereby incorporated by this reference.

Defendant filed no pretrial motion with respect to the tape recording or the transcript of the interrogation.

After the State had presented the testimony of some thirteen witnesses during its case in chief, it called Deputy Russell to identify the tape recording of the Spokane interrogation and then offered the recording into evidence. Defense counsel then asked for a five-minute recess so that he could reread the transcript of the recording. There then followed proceedings out of the presence of the jury during which defense counsel objected to the admission of the tape recording on the grounds, inter alia, that the State had failed to establish that defendant had adequately been advised of his *Miranda* rights and that the admissions had been voluntarily given.

**2.** Under SDCL 23A–14–29, the State may not grant immunity from a prosecution for perjury arising out of false testimony given under a grant of immunity. Accordingly, it is not within our power to direct that the State confer such immunity in order to obtain Helmey's testimony on remand. *Cf. State v. Abraham,* 318 N.W.2d 775 (S.D.1982).

The State responded by pointing out that defense counsel had been notified of the existence of and been given a transcript of the tape recording well before trial and yet had failed to file a motion to suppress the recording pursuant to SDCL 23A–8–3, which provides in pertinent part:

Any defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

. . . .

(4) Motions to suppress evidence; . . .

In response to the deputy state's attorney's statement that the State's pretrial memorandum had put defendant on notice to make a timely motion to suppress, defense counsel stated:

MR. RENSCH: I just want to say that's probably the funniest thing I ever heard a lawyer say in a courtroom. He wants—he thinks that because this statement—I was told about this tape recording that therefore it suddenly becomes admissible.

. . . .

What counsel is saying is that because I didn't make some kind of a ridiculous motion to suppress the introduction of Tim Holmes' statement, Keith Iwan's statement, everybody else's statement, that he can traipse somebody up there on the stand and say, "Yes, I took a statement from Keith Iwan and I'm going to introduce it into evidence because counsel has not moved to suppress it." Now, it's just as simple as that. Everybody in this courtroom that's got a law degree knows that this tape recording is not admissible, especially at this moment.

Defense counsel then went on to argue that SDCL 23A–8–3 applies only when a defendant has positive knowledge that the State intends to introduce certain evidence.

After listening to Russell's testimony regarding the voluntariness of defendant's statements, the trial court admitted those statements made by defendant up to the point where he requested that he be allowed to talk to his attorney.

■ Although the preferred procedure is to examine claims of ineffective assistance of counsel only in the context of post-conviction proceedings, we make exceptions to that rule in cases where the representation was so casual that on the face of the record it appears that there was a manifest usurpation of the defendant's constitutional rights. *See State v. Tchida*, 347 N.W.2d 338 (S.D.1984), and cases cited therein.

■ We conclude that the record before us manifests on its face that defense counsel's representation of defendant on this particular issue fell below an objective standard of reasonableness. *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). SDCL 23A–8–3(4) was adopted as part of the criminal code revision in 1978. *See* 1978 S.D.Sess.Laws ch. 178, § 108. The procedure mandated by that statute carries out the intent expressed in *State v. Thundershield*, 83 S.D. 414, 160 N.W.2d 408 (1968), that the admissibility of confessions and incriminating statements should be made in an independent hearing outside the presence of the jury. Here, defense counsel had full knowledge several months before trial that the State possessed a recording of the Spokane interrogation. It was incumbent upon him to file a pretrial motion to suppress this recording if he had any intention of objecting to its being introduced into evidence. We know of no possible strategic advantage that could have been obtained by defendant's refusal to comply with the dictates of the statute. Accordingly, we agree with defendant that defense counsel's representation in this regard constituted the ineffective assistance of counsel. *Lufkins v. Solem*, 716 F.2d 532 (8th Cir.1983).

There remains the question whether defendant was prejudiced as a result of counsel's ineffectiveness. We turn, then, to defendant's next issue.

## III.

### *The Trial Court's Failure to Make A Ruling On the Voluntariness of Defendant's Statements*

Following the colloquy between the trial court and counsel regarding defense counsel's failure to make a pretrial motion to suppress, the in-camera hearing proceeded with the State's examination of Russell regarding the circumstances under which he and the prosecutors had interrogated defendant in Spokane. Russell testified, and his testimony is borne out by the transcript of the interrogation, that he advised defendant of his *Miranda* rights, that defendant replied that he understood those rights, and that in response to Russell's question whether he wished to waive those rights and talk to Russell and the prosecutors, defendant replied, "Sure. I mean, I've always been fair with you before haven't I?" Defense counsel then cross-examined Russell with respect to the giving of the *Miranda* warnings. Following an off-the-record discussion, defense counsel continued as follows:

Q. (By Mr. Rensch) Dwane, my client just told me that every time he has ever talked to you guys he always had his lawyer with him, Randy Connelly, and he tells me that you knew he had a lawyer in this proceeding. Is that true?

A. Yes.

Q. And how many times did you talk to Randy Connelly and Don Wiegers before you went out to Washington?

A. Together?

Q. Yeah.

A. Once.

Q. Once? Now, you had been advised that Randy was his lawyer however, we're not going to quarrel about that. You knew that, didn't you?

A. Yes.

Q. Roger Tellinghuisen knew that Don Wiegers was represented by Randy Connelly, didn't he?

A. Yes.

Russell also acknowledged that attorney Connelly had been contacted about and was aware of the polygraph examination that had earlier been administered to defendant. On redirect examination, Russell testified as follows:

Well, I talked to him [defendant], as far as my records show, four times. On 8/2 of '82 we was in Randy Connelly's office where I talked to everyone. And then on 12/22 of '82 I stopped into Mr. Wiegers' store and talked to him briefly. And I had talked to Randy Connelly beforehand and asked him if it's all right if I go down and visit, and he said yes.

During recross-examination Russell testified:

[By Mr. Rensch]

Q. So each time during this period of time before you talked to Mr. Wiegers you got Randy Connelly's permission, is that it?

A. Except for the last time in Spokane I didn't talk to Mr. Connelly, no.

Defense counsel then renewed his motion to suppress the tape recording, expanding the motion to include the objection that the interrogation in Spokane had been conducted by the State with full knowledge that defendant was being represented by attorney Connelly. The trial court denied the motion and admitted the tape recording up to the point where defendant said, "I think, I'd like to have Randy Connelly around here before I continue." (We note that the written transcript of the recording goes on for some eight or nine more pages following this request for Connelly's assistance.)

South Dakota Constitution Article VI, § 9 states in part: "No person shall be compelled in any criminal case to give evidence against himself...."

■ The State argues that defendant waived his right against self-incrimination and that therefore his Spokane statements were voluntary within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We do not agree. In

*State v. Holland*, 346 N.W.2d 302 (S.D. 1984), we held that the State had failed to meet its heavy burden of showing a waiver of the right against self-incrimination where the record was clear that a police officer and an assistant attorney general had interviewed the defendant in an Oregon jail knowing that the defendant was represented by a South Dakota attorney and being aware that there was a prior agreement that the defendant would not speak unless his South Dakota attorney was present. We are satisfied that the record in the case before us manifests with equal clarity the fact that the agents of the State knew that defendant was represented by an attorney with respect to the charges against him and that the attorney had either been present during all prior interrogations or had given permission for interrogation to take place in his absence. We conclude that to permit the State to introduce the recording of the Spokane interrogation would make a mockery of the right against self-incrimination guaranteed by South Dakota Constitution Article VI, § 9. By no stretch of the imagination can it be said that defendant initiated the Spokane interrogation. *Cf. Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).[3]

██ We also conclude that the Spokane interrogation violated defendant's constitutional right to the effective assistance of counsel guaranteed him by South Dakota Constitution Article VI, § 7, quoted in full above.

Defendant had been indicted on January 28, 1983. He was being represented by counsel with respect to the matter that led to the indictment. That being the case, the post-indictment conduct of the State's agents in interrogating defendant in the absence of and without notice to his counsel constituted a violation of the principles set forth by the United States Supreme Court in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In reaching our conclusion regarding the violation of defendant's rights under §§ 7 and 9 of Article VI of the South Dakota Constitution, we point out, as noted in Justice Henderson's special concurrence in *State v. Holland, supra*, 346 N.W.2d at 309, that the South Dakota Code of Professional Responsibility forbids unconsented communication between a lawyer and a represented party. Canon 7, Disciplinary Rule 7–104, provides in part:

(A) During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so....

SDCL 16–18 (Appx.).

██ The protection afforded a criminal defendant by Article VI, §§ 7 and 9, must be held to be at least co-extensive with that provided by the Code of Professional Responsibility to a party in a civil action.

We offer no opinion whether the Spokane interrogation violated defendant's rights under the Fifth and Sixth Amendments to the United States Constitution. We hold only that defendant's right to the effective assistance of counsel and his privilege against self-incrimination as guaranteed to him by South Dakota Constitution Article VI, §§ 7 and 9, were transgressed by the State. Accordingly, the trial court should not have admitted the tape recording.

There remains the question whether the trial court's failure to suppress the tape

---

**3.** In *State v. Adkins*, 88 S.D. 571, 225 N.W.2d 598 (1975), we held that the defendant had effectively waived his right to have his counsel present during interrogation. *Adkins* was, of course, decided prior to the decision in *Edwards*. Also, we noted that defense counsel had agreed to having the polygraph examination that led to the confession conducted in his absence.

recording requires a reversal of the convictions. We conclude that it does not.

■ The statements made by defendant in Spokane were not in the nature of a confession. At most, they constituted only an admission by defendant that he had been approached by Iwan. The relevant portions of the transcript are as follows:

Russell: Well Don, let me finish okay. Awright, now I understand you know, this here is kind of a deal among friends. It got started off with Melvin Brown using Keith Iwan. Keith Iwan is a friend of his. Your [sic] a friend of Keith Iwan's and so he comes to you. It's kind an abusing of friendships here wouldn't you say so?

Defendant: (no verbal response)

Russell: Uh? Can you tell me a little bit about how Keith talked you into this?

Defendant: I'll tell you it wasn't Keith who talked me into it.

Russell: Who talked you into it?

Defendant: Is [sic] was that truck guy and he didn't talk me into it, he talked to Tim Holmes. He didn't talk to me you know.

. . . .

Defendant: I never gotten [sic] the money. .

. . . .

Defendant: There's still something that I can't figure out about it. There's alot of it I can't figure out.

Russell: How did Keith approach you on this? Do you remember?

Defendant: I can't remember how they did this? He wasn't the only one of them.

Russell: Well, for right now let's just say that Keith approached ya okay. He was the first time.

Defendant: I don't know if it was he the first time or the second time. I don't know which one it was. But there wasn't no (inaudible).

Defendant: I can't remember.

Russell: Well, Don you had to pass out the information. You had to give it to Holmes. The telephone number, you had to pass on to Whitesell what the name was.

Defendant: I'll tell you one thing, I wasn't, I wasn't (inaudible).

. . . .

As can be readily seen, defendant's answers were far less incriminatory than was his testimony before the jury regarding his involvement with Iwan, Holmes, Whitesell, and the unnamed, unknown truck driver. True, the interrogation included Tellinghuisen's summary of the State's evidence against defendant and Tellinghuisen's opinion that defendant was "a screwed pooch," but defendant did not acknowledge the truth of Tellinghuisen's statements. Accordingly, when considered in the light of the totality of the evidence, defendant's tape recorded statements were so innocuous that we conclude that it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty even if the recording had not been admitted into evidence. *See, e.g., United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *State v. Bittner,* 359 N.W.2d 121 (S.D.1984); *High Elk v. State,* 344 N.W.2d 497 (S.D.1984); *State v. Waller,* 338 N.W.2d 288 (S.D.1983).

## IV.

*Corroboration of Accomplice Testimony*

Defendant next argues that the trial court erred in denying his motion for judgment of acquittal based on the ground that there was insufficient evidence to corroborate the testimony of the accomplices. We do not agree.

The trial court instructed the jury that Iwan, Holmes, and Whitesell were accomplices as a matter of law.

SDCL 23A–22–8 provides:

A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows

the commission of the offense, or the circumstances thereof.

We have set forth the standard for testing the sufficiency of corroborating evidence as follows:

> The testimony of an accomplice need not be corroborated by evidence sufficient to sustain a conviction. *State v. Martin,* 287 N.W.2d 102 (S.D.1980); *State v. Moellar,* 281 N.W.2d 271 (S.D. 1979); *State v. Willers,* 75 S.D. 356, 64 N.W.2d 810 (1954). But, the corroborating evidence must tend to: (1) affirm the truth of the testimony of the accomplice; and (2) establish the guilt of the defendant. *State v. Martin, supra; State v. Moellar, supra.* The testimony of the State's corroborating witnesses meets these requirements.

*State v. Nelson,* 310 N.W.2d 777, 778 (S.D. 1981).

 Circumstantial evidence can supply the necessary corroboration. *Id.* at 779.

 Corroborating evidence can come from the defendant. *State v. Feuillerat,* 292 N.W.2d 326 (S.D.1980).

 The testimony of one accomplice cannot be regarded as corroborating the testimony of another accomplice within the meaning of SDCL 23A–22–8. *State v. Dominiack,* 334 N.W.2d 51 (S.D.1983); *State v. Stecker,* 79 S.D. 79, 108 N.W.2d 47 (1961); *State v. Quinn,* 69 S.D. 574, 13 N.W.2d 50 (1944).

 We conclude that the corroborating evidence introduced by the State, though not overwhelming, was sufficient to satisfy the requirements of SDCL 23A–22–8, and our cases cited above. In addition to the evidence we have already detailed above, the State introduced testimony from Keller's widow that corroborated the false wrecker call that lured Keller to the scene of the aborted murder attempt. Whitesell described accurately the weapon that Waff had shown to him and which was used to kill Keller. He described in detail the "x" that Waff had placed on the bullet that was later removed from Keller's skull. A bank officer testified that Brown had borrowed $2,000 in mid-September of 1981 for the ostensible purpose of building a lean-to to his mobile home.

Moreover, defendant's own testimony tended to prove the truth of the accomplices' testimony that defendant was part of the conspiracy to murder Keller. Without repeating that testimony in detail, we note, as set forth more fully above, that he acknowledged being approached by Iwan in February and March of 1981; that Iwan had given him an envelope to give to Holmes; that Holmes had taken a shotgun from the store in April or May of 1981 (identified by Holmes as the one he took with him on his first attempt to kill Keller); and that he had given Whitesell some speaker wire, some speakers, and a stereo unit in exchange for some personal property.

There was testimony from an individual who had been employed by defendant during 1981 that Holmes, Whitesell, and Iwan had been in defendant's store from time to time during that year.

We conclude, therefore, that the State's corroborating evidence was sufficient to affirm the truth of the accomplices' testimony and to establish defendant's guilt.

## V.

### First and Second Degree Manslaughter Instructions

As stated above, defendant was found guilty of second-degree manslaughter as well as of the two counts of conspiracy to commit murder.

 We note that when the trial court proposed the instructions on first and second degree manslaughter the State objected, arguing that the evidence supported, if anything at all, only a conviction of first-degree murder. Defense counsel, however, not only did not object to the proposed instructions but stated, "[M]y client would prefer to leave those lesser included offenses in the lawsuit." Accordingly, defendant failed to preserve any error for

appeal. *See, e.g., State v. White Mountain*, 332 N.W.2d 726 (S.D.1983).

Likewise, if the court erred in giving the lesser included offense instructions it was error that was invited by defendant and thus not subject to appeal. *State v. Johnson*, 272 N.W.2d 304 (S.D.1978); *State v. Parker*, 263 N.W.2d 679 (S.D.1978).

### Defendant's Issues

Defendant has raised four issues in his *pro se* brief, which was filed with our permission. We have carefully examined these issues and conclude that they raise no issue of reversible error.

### CONCLUSION

The judgment of conviction entered on Count I is affirmed. Pursuant to SDCL 15–26A–12, *State v. Stumes*, 90 S.D. 382, 241 N.W.2d 587 (1976), and *State v. Faller*, 88 S.D. 685, 227 N.W.2d 433 (1975), we remand the case to the circuit court for further proceedings as outlined above with respect to the convictions on Count II and of second-degree manslaughter. If the trial court determines that there is no need to grant a new trial for the purpose of permitting a jury to hear the testimony of Helmey, Ventling, or Downen, the judgment of conviction will be affirmed in all respects. Otherwise, the trial court shall grant a new trial with respect to Count II and the conviction of second-degree manslaughter.

FOSHEIM, C.J., MORGAN, J. and DUNN, Retired J., concur.

HENDERSON, J., concurs in part, specially concurs in part, and dissents in part.

DUNN, Retired J., participating.

WUEST, Acting J., not participating.

HENDERSON, Justice (concurring in part, specially concurring in part, and dissenting in part).

I join this opinion in affirming the conviction on conspiracy to commit murder Count I.

I further specially join this opinion for remand of this case on conspiracy to commit murder Count II. My special concurrence on this conviction is simply this: It appears that defendant's constitutional right to call witnesses on his own behalf and his constitutional right to confront witnesses against him have been violated; the State has a heavy burden, in my opinion, of overcoming a transgression of these constitutional rights; and finally, the trial court's findings of fact and conclusions of law in this matter are subject to appellate scrutiny with the attendant scope of review that they are presumed to be correct but can be determined to be clearly erroneous. *State v. Brim*, 298 N.W.2d 73 (S.D.1980).

However, I dissent on the second-degree manslaughter conviction. Second-degree manslaughter is a reckless killing of another human being. SDCL 22–16–20. Reckless imports

> a conscious and unjustifiable disregard of a substantial risk that the offender's conduct may cause a certain result or may be of a certain nature. A person is reckless with respect to circumstances when he consciously and unjustifiably disregards a substantial risk that such circumstances may exist[.]

SDCL 22–1–2(1)(d). There was nothing reckless about this killing. It can hardly be termed reckless when several individuals plot to kill the victim over seven to eight months' time; money and weapons are procured and exchanged; a plan is devised; three failed attempts are made and on the fourth and fatal attempt, the victim is shot in the head at a distance of six inches or less, he is stabbed eight times, and his body is dragged into the woods. The facts are an antithesis to second-degree manslaughter and it is oxymoronic that a jury found defendant guilty of both conspiracy to commit premeditated murder and second-degree manslaughter.

Under the plain error rule, SDCL 23A–44–15, I would reverse the conviction for second-degree manslaughter.*

---

* The present case is dissimilar to *State v. White Mountain*, 332 N.W.2d 726 (S.D.1983), wherein

The trial court can only instruct the jury on matters supported by the evidence. *See State v. Fender,* 358 N.W.2d 248 (S.D. 1984); *Miller v. State,* 338 N.W.2d 673 (S.D.1983); *State v. Chamley,* 310 N.W.2d 153 (S.D.1981); *State v. Oien,* 302 N.W.2d 807 (S.D.1981); *State v. Curtis,* 298 N.W.2d 807 (S.D.1980); *State v. Wilson,* 297 N.W.2d 477 (S.D.1980); *State v. Bean,* 265 N.W.2d 886 (S.D.1978); and *State v. Kafka,* 264 N.W.2d 702 (S.D.1978). In first-degree murder trials, the trial court can instruct the jury on first- or second-degree manslaughter, only if the evidence presented could rationally have supported a conviction of the latter offenses. *State v. Waff,* 373 N.W.2d 18, 21 (S.D.1985). Here, construing the evidence most favorably for the defendant, it is impossible to conclude that the evidence presented could rationally support a second-degree manslaughter conviction. The defendant, as in *Waff,* was guilty of premeditated murder or he was guilty of nothing. Thus, the trial court erred in giving the second-degree manslaughter instructions.

this Court refused to apply the plain error rule where counsel had ample opportunity to object to the proffered instructions but failed to do so. Here, even though defendant invited the second-degree manslaughter instructions, the evidence weighs so heavily against the instruction that it was incumbent on the trial court not to give those instructions.